96 Cal.Rptr.2d 640 (2000)
81 Cal.App.4th 322
The PEOPLE, Plaintiff and Respondent,
v.
Ryan Patrick TOLEDO, Defendant and Appellant.
No. B126748.
Court of Appeal, Second District, Division Two.
June 7, 2000.
Review Granted September 20, 2000.
*642 David P. Lampkin, Los Angeles, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Senior Assistant Attorney General, Kyle S. Brodie and Renee Rich, Deputy Attorneys General, for Plaintiff and Respondent.
*641 COOPER, J.
Following a jury trial, appellant Ryan Patrick Toledo was convicted of attempted *643 terrorist threats as a lesser included offense of the charged crime of terrorist threats (Pen.Code, §§ 422/664; Count 1) and was convicted of assault with a deadly weapon or by means of force likely to produce great bodily injury on Joanne Ortega Toledo, his wife. (Pen.Code, § 245, subd. (a)(1); Count 2.)[1] There is evidence that he threatened her with death and came towards her with scissors.
In a bifurcated proceeding, a jury having been waived, the trial court found prior conviction allegations true and found Count 2 to be a serious felony within the meaning of section 667, subdivision (a)(1). The court selected the midterm on Count 2, three years; doubled the term to six years (section 1170.12(a) through (d)); and added an additional five years pursuant to section 667(a)(1), an addition that appellant challenges on appeal. A one year sentence for Count 1 (attempted terrorist threat) was stayed pursuant to section 654.
Appellant appeals the judgment of conviction. He challenges the five-year enhancement as well as the validity of the attempted terrorist threat conviction. Finding no error, we shall affirm.

PROCEDURAL HISTORY AND STATEMENT OF FACTS

Mrs. Toledo's testimony at trial[2]
Joanne Ortega Toledo was living with her husband, appellant, and their then one-year-old daughter in an apartment on Red Bud Place in Canyon Country on Friday, January 9, 1998.[3] They had moved to the complex in October 1997. Directly across the driveway from the Toledos lived Marychelo Guerra and her husband Benjamin Guerra. Appellant had picked up his wife at Macy's Burbank, where she worked, and they got home about 8 or 8:15 p.m. He appeared to be "very exhausted, and not feeling very well and upset." He had spent the day taking care of their daughter and then dropping off the infant. He was upset that, when he was very tired, his wife had spent ten to fifteen minutes talking with her supervisor about what was going to take place the next day on her shift; he felt she should have told the supervisor she would call her at work or at her home because he was anxious to get home. Appellant got into the passenger seat, and Mrs. Toledo drove home.
When they got home, she was tired and wanted to take a shower and relax. He wanted her to "[gi]ve him love." As she came out of the bathroom, appellant started to have a tantrum and "wanted me to lay down with him and take care of him" but she said she was tired. After conversing with him, she closed and locked the bathroom door to be by herself. She came back out and started yelling at him, telling him she was tired and exhausted and wanted some time for herself. When she went to the closet, he threw a telephone at *644 the open closet door, causing a hole in the plywood door; the phone book landed about four feet from her. She figured it was "part of his tantrum." Following him into the front room, she yelled "Great, let's break things" and threw a lamp in the hallway, about six to seven feet from appellant.[4] Appellant then punched a hole in the door to their daughter's room. He next went into the kitchen to make something to eat. She went back into the room, and they kept yelling at each other. Appellant was screaming things to irritate her. She asked why he had to have a tantrum and why he could not understand that she did not feel like giving him attention and just wanted to take a shower.
Mrs. Toledo then returned to the front room and sat down on the couch with her hands by her side; her fingers might have been lightly underneath her thighs. Contrary to her statement to the deputy that night, she testified that she could not recall anyone, including appellant, telling her to put her hands underneath her legs. Appellant came over and started yelling at her, calling her a bitch. She was also yelling at him and "was thinking about what type of things I could say to him to piss him off." She extended her foot as if to kick him, and appellant said he was not going to hurt her and returned to the kitchen. When he came over to the couch, she again put her leg up and he walked away. She denied using her legs to defend herself; however, she admitted that appellant approached her with a metal object and, thinking he might strike her, she then raised her hands to her forehead.[5] She realized they were both acting childish so she sat outside to cool off and, barefoot and without a raincoat or purse, decided to go over to her friend Mary Guerra's house in the rain.[6]
When she got to her neighbor's she was crying and was shaking "[p]robably from the cold" but not because she was frightened. Mary knew about Mrs. Toledo's previous marital problems and that earlier in the year, appellant had left and was seeking to get a divorce. So Mary sat beside Mrs. Toledo and knew she was distraught about her marriage failing. While crying, Mrs. Toledo talked to her neighbor about why she couldn't have the "perfect marriage" and a "happy white picket fence." She also told Mary that appellant appeared very upset with her and they were both "just going at each other."
As Mrs. Toledo was sitting there with her friend, appellant called on Mary's phone. The women did not answer the phone, but Mrs. Toledo could hear the message on the voice mail. Appellant told her to come home and clean up the mess. When he called again, Mary took the call and told him his wife was not there. Mrs. Toledo was crying and upset and did not feel like talking to him; she told Mary to tell appellant she wasn't there because she did not feel like fighting with him.
When Mary's husband came home, Mrs. Toledo apologized for interrupting their home and started to go home. Mary offered to come with her. As they walked over, they heard appellant falling down the stairs and Mrs. Toledo thought "Oh, uh-oh. He's going to be really pissed off because he fell down the stairs." The women went back to Mary's home because Mrs. Toledo "didn't want to take care of him and didn't want to hear about how he was pissed off that he fell down the stairs." Mary's husband *645 was surprised to see them back. He was looking out the peephole and Mary was looking out her window.[7] There was a security guard outside, probably because her husband was blasting music while she was over at Mary's.
After his fall, appellant followed the women back to Mary's house. He ran ahead of Mary and seemed to be running to catch up with his wife. Appellant said something to her on top of the stairs, turned around, and walked away. Mrs. Toledo could not hear what he said and did not turn around because she did not want to talk to him. A security guard was present.
When Mrs. Toledo next decided to leave Mary's apartment, the police had arrived. Appellant, who had left the apartment, had put a picture over the hole in their daughter's door. While sitting with the deputies in her apartment, Mrs. Toledo heard the phone ring six or seven times. The police answered the phone after she kept hanging it up. Appellant was calling. Mrs. Toledo did not spend the night at home. She testified that the officer forced her to go to her mother's house though she wanted to stay home, take a shower, relax, and get ready for the next day at work. According to her trial testimony, the officer said he would not leave unless he could take her somewhere. The officer drove her to her mother's house in Castaic because appellant had the house key and the keys to her car with him. Her parents brought her and her daughter back to the apartment the next morning so she could go to work.[8]
Mrs. Toledo testified that she loved her husband the night in question as well as at the time of trial. She denied that appellant made any threats to her that night or telling the deputy that he had.[9] She did tell the deputy that appellant said he "wasn't going to hurt her because he didn'tI wasn't worth going to jail for." In response to the deputy's question whether she had some marital problems, she said yes. In addition, she showed the deputies the holes in the wall.
According to Mrs. Toledo, their marriage had come to a boiling point because of their egos and immaturity. She told a detective that appellant was correct that she put other things ahead of him and that she does not love him enough.
On cross-examination, she testified that they both frequently "push each other's buttons." She was not in fear of appellant and told the deputy that appellant told her "I hate you. I wish you were dead." As the police report stated, Mrs. Toledo explained that the statements were said in anger and did not really mean he wanted to kill her. She also told them that she did not know if appellant kicked the screen out of the front door or threw the iron outside because she was inside Mary's apartment at the time. According to Mrs. Toledo, she told the deputies that she did not feel in any danger that night, had not called the sheriffs department, and did not want her husband to be charged with a crime. She even signed something saying she would not prosecute him. Moreover, she testified that she suffers from anxiety and has seen psychiatrists and has taken Prozac; *646 she feels she was overreacting and overanxious on the night in question.

Marychelo Guerra's testimony
Mrs. Toledo's neighbor, Mary, testified that when the victim came over to her apartment that night, Mrs. Toledo was crying and looked frightened and scared, not anxious. According to the neighbor, Mrs. Toledo told her that appellant and she had an argument when she got off work about her going straight to the car. He had come after her with a pair of scissors and said "Death becomes you." Further, Mrs. Toledo demonstrated how appellant held the scissors and how she put her leg and hand up to protect herself and try to push appellant away.
While the victim was still at Mary's apartment, appellant came over to ask if his wife was there; he spoke in a calm voice and said he wanted Joanne home to clean up the place, clean up her mess. The neighbor told him his wife was not there, and he walked away. Mrs. Toledo was scared, and Mrs. Guerra helped her hide in the bedroom closet before he arrived. Appellant called and asked for his wife. When told she was not there, he said to "tell the hood rat Joanne when you see her to get home."[10]
Mary was also scared. The victim at one point wanted to jump from the balcony down a floor to a patio to get outside the Guerra apartment. Mrs. Guerra called for security in her building to witness walking the victim down the stairwell. Security advised her to call the Sheriffs Department and not to get involved. Nevertheless, she walked her friend down the stairs; Mary's husband, Mr. Guerra, was home by then and stood at the front door on the stairwell. As the women walked down, appellant screamed out "Mary, I told you not to get involved." Appellant ran down his stairwell, fell, and started to chase his wife towards the Guerra home. Mrs. Guerra screamed "No." Appellant stopped, turned around and laughed. Security was pulling up when appellant was chasing his wife towards the Guerra apartment.
As Mrs. Toledo ran up the stairs, with Mary Guerra behind her, Mrs. Guerra heard appellant yelling from his living room window. Appellant tore out a screen and they heard a bang, either causing them to run or as they ran up the stairwell. It sounded like a gun.[11] They crawled to the back bedroom and Mrs. Guerra told her friend "I am sorry. I am calling the sheriffs." She called 911.
According to Mrs. Guerra, as the sheriffs arrived, Mrs. Toledo used a cordless phone to close her bank accounts. The sheriffs checked the Toledo apartment while Mrs. Guerra stayed with her friend on the opposite side of the building. Deputies walked each woman each back to their respective homes. After the sheriffs arrived, Mrs. Guerra saw a shattered iron where she had heard the bang, and there was an indentation on the wall at that location and the stucco was chipped off, with cement on the iron.
Later, Mrs. Guerra watched Mrs. Toledo pack up to make sure she was all right. Mrs. Toledo said she was going to her mom's house but did not mention whose decision that was. Mrs. Guerra did not hear the phone ring while she was at Mrs. Toledo's apartment, but her friend was on the phone.
On cross-examination, Mrs. Guerra admitted she and her own husband had had an argument the night before or a few days before the incident involving appellant. She asked him to leave, saying "You can leave. I don't care where you go. You can sleep in the garage for all I care." She denied telling her husband that she *647 would charge him with rape if he did not leave.

Testimony of security guard
Devin Chapman, a security guard for the apartment complex, responded to Mary Guerra's phone call. As he pulled up, he heard yelling and saw appellant ripping the screen out of the window of his apartment and yelling profanity such as "Fuck you, you bitch." The security guard asked appellant what was going on, and appellant replied: "It's none of your fucking business." The guard responded: "Well, you're destroying company property. It's turning into my business." Appellant continued to yell profanities. The guard proceeded forward to park his car, taking his eyes off appellant for three to four seconds.
The guard next heard footsteps coming down the stairwell and heard a loud thud or crash. He could see pieces of plastic and metal falling into the bushes below and then heard frantic footsteps running back up the same steps. A broken iron was in the bushes. The guard contacted his supervisor.
As the guard waited, appellant returned inside his apartment, closed the window and continued to yell. Every other word was profanity. His supervisor and the sheriffs department then showed up. Mrs. Toledo was crying and looked really frightened.

Testimony of Deputy Sheriff Roy Henstrand
On January 9, 1998, at about 8:30 p.m., Deputy Sheriff Roy Henstrand was working in Canyon Country when he was dispatched on a domestic violence call to an apartment complex on Red Bud Place. He interviewed Joanne Ortega Toledo, Mary Guerra, and the security guard. In addition, he spoke to appellant by telephone but not in person that night.
Because it was pouring rain, he suggested that they go to Mrs. Toledo's apartment for the interview. Before going there, other deputies checked for appellant, who was not in the apartment. Nevertheless, Mrs. Toledo requested that he again search the entire apartment and look underneath the beds for appellant. After he checked, she went inside with him. She was very wet from the heavy rain, was crying and "hysterical almost."
The deputy was with Mrs. Toledo about four hours that night. He testified that appellant's wife made the following statements to him that night: When appellant picked her up at work, a verbal argument started over his wife's talking to her supervisor. Appellant told his wife the supervisor wanted to flaunt a more expensive car and her wealth. The argument continued on their drive home and as they went upstairs to their apartment. When his wife told appellant she wanted to go over to her friend Mary's house, appellant said he did not want her to go and threw the phone across the room into a closet door. When appellant did that, she was afraid for her safety. She went into the bathroom to take a shower and locked the door to keep appellant out.
Appellant told her that if she did not unlock the door and come out, he would destroy the apartment. She came out of the bathroom. He picked up a dining room table chair and threw it across the apartment, striking a free-standing lamp. Appellant then followed her down the hallway and punched a hole in their daughter's bedroom door. She then told appellant that she did not care if he destroyed the apartment, and she picked up a lamp in the bedroom and dropped it to the floor. At that point, appellant told her "You know, death is going to become you tonight. I am going to kill you." She stated she did not care, as if she had given up hope and "just do what you have to do," not that she really did not care. At his direction, she went into the front room, sat on the couch, and placed her hands underneath her legs. Then he walked away from her, came back holding an object she *648 could not identify, and approached within three feet of her with his hand over his shoulder. As appellant lowered the object toward her, she lowered her face and ducked. After doing this, appellant told her: "You don't want to die tonight, do you?"
Appellant then walked back into the dining area and immediately returned. When he returned, she could identify the object in his hands as scissors.[12] Appellant approached her and in a rapid movement lowered the scissors downwards to her right upper shoulder, the right side of her neck, stopping only inches away from her. As the scissors were coming down, she leaned back on the couch and put up her feet to block the attack. She was afraid appellant was going to kill her.[13] Appellant then said: "You don't want to die tonight, do you? You're not worth going to jail for." Mrs. Toledo then left the apartment and sat outside in the rain before going over to her friend Mary Guerra's apartment.
While the deputy was interviewing Mrs. Toledo, the phone rang many times. Mrs. Toledo picked it up the first time and, after talking, hung up. The phone rang again in less than a minute; she asked the deputy to answer, and it was a gentleman asking to talk to her. The deputy talked to the person on the phone and asked him to return to the location to get his side of the story. Appellant hung up and called again. This deputy answered the phone several times; he or another deputy answered the phone about twelve times. At one point, Deputy Hudson handed the victim the phone. Mrs. Toledo took the phone but hung up when she discovered it was not her brother.
Deputy Henstrand called a commissioner to get an emergency protective order. Deputy Hudson offered to get one, and Mrs. Toledo stated she would like a protective order. While on the phone to the commissioner, call waiting indicated incoming calls three times. After hanging up, defendant called; the deputy again asked him to come over and notified him there was a legal court order in effect. Appellant became very irate and accused the deputy of being his wife's boyfriend/lover although they in fact had no relationship at all. Appellant also threatened him, stating he was the godson of a very high-ranking sheriffs official. The deputy hung up, but the phone kept ringing. Mrs. Toledo was crying as the phone calls kept coming and saying how disappointed her family was in her life.
Deputy Henstrand informed Mrs. Toledo it would be good if she went somewhere else in view of the violence. She agreed and said she would go to her mother's house in Castaic. He denied forcing her to leave the apartment that night or telling her he would not leave the apartment unless she would go somewhere to spend the night. Mrs. Toledo called her mother and stepfather to make sure she could go there. She was going to drive herself but could not find her car keys; appellant called and indicated he had them. Therefore, the deputy offered to drive her to Castaic.

*649 Defense

Appellant did not testify. Benjamin Guerra, the husband of Mrs. Toledo's friend Mary, testified as did Mrs. Toledo and Detective Susan Vaziri. According to Mr. Guerra, they all were in his apartment when the iron was thrown. On cross-examination, he testified that, when he came home that night, he saw appellant, who was acting "hot-tempered" and told Mr. Guerra he was "just pissed off." Mr. Guerra went to his own apartment, and found the chain was on the door. His wife let him in, and he saw Mrs. Toledo in their apartment; she looked scared, was kind of huddled up, and she looked as if she had been crying.
Mrs. Guerra attempted to walk her friend back home as Mr. Guerra watched from the top of the stairway because he was concerned for his wife. He heard appellant shouting and saw the two women hurry back to his apartment, with appellant following them. Mrs. Toledo picked up her pace and ran up the stairs, going past Mrs. Guerra. After reaching the first step of Guerra's stairwell, appellant returned to his apartment. Appellant opened the windows of his apartment, kicked the screen out, and said "Do you know what a nine millimeter can do?" Mrs. Toledo was then just inside the Guerras' doorway, and his wife was making her way in, using the stairway. A second after his wife came in the apartment, they heard a pop.
Mrs. Toledo's testimony for the defense was that she spent 45 minutes to an hour with the deputy at her apartment and another 25 to 30 minutes with him driving to her mother's place. The police came looking for appellant four times, but he was never there.
Detective Vaziri testified she was never in appellant's apartment. She talked to appellant's wife on the Monday four days after the incident. Mrs. Toledo told her that she was concerned that the emergency protective order contained misstatements that made the incident sound more serious than Mrs. Toledo thought it was. Mrs. Toledo told the detective appellant was not trying to hit her with the phone, that she did not lock the door to get away from appellant; and she denied just about everything that had been written.[14] Mrs. Toledo came to the Sheriffs station and signed a refusal to prosecute form on January 13.
Some time after a warrant issued on January 15, a man identifying himself as appellant called the detective. He told her that the "whole thing was bullshit, that his wife didn't want anything done, nothing happened that night, we were out to get him, it wasn't fair. He went on and on with some profanity...." The deputy told the caller that the Sheriffs Department was looking for him and asked if he would make arrangement to surrender himself. He refused, said they would never find him, told her "to fuck off," and hung up.
The department was actively looking for appellant and even received phone calls from Mary Guerra stating he was around the apartment, was babysitting, and so forth. When they got to the apartment, no one answered the door and they left.

Jury deliberations and verdict
Soon after retiring to deliberate, the jury asked: "Is it true that Count 2 is separate from Count 1; i.e., that P.C. section 245(a)(1) is not a lesser-included offense to P.C. section 422?" The court answered in the affirmative.
*650 The jury later requested all testimony by Detective Hendstrand about "Joanne's identification of the scissors. Includeall questions & responses about the location of the scissors and why the deputy picked them up." The jury thereafter inquired: "Does the brandishing of scissors (re PC § 1202.2(b)(1)) have to coincide (simultaneously) with the alleged verbal threat? (on Count One)." The court responded: "This can be answered only by directing your attention to the instructions previously given, particularly 17.16 and the language 'in the commission or attempted commission of the crime.'"
The jury retired to deliberate on a Friday afternoon at 2:30 p.m. and reached a verdict the next Monday afternoon. After the verdicts were returned, appellant filed a motion in arrest of judgment arguing that "an attempt to commit a terrorist threat is a conceptual impossibility and thus does not constitute a public offense." Just as California does not recognize attempted assault as a crime (In re James M. (1973) 9 Cal.3d 517, 522, 108 Cal.Rptr. 89, 510 P.2d 33), appellant argued that there cannot be an attempted threat, "[s]hort of a stuttering or mute defendant."
The court found the alleged prior to be true and denied appellant's motion in arrest of judgment as to Count 1.

CONTENTIONS ON APPEAL
Appellant contends: 1. The five-year enhancement must be reversed because it is based on appellant's use of a deadly weapon, but the jury found appellant did not use a deadly weapon. 2. Attempted terrorist threat is not a crime. 3. As applied to a crime punishing speech, the general provisions of section 664 are constitutionally overbroad.

DISCUSSION

1. The five-year enhancement was properly imposed,
The jury found appellant guilty of Count 2, section 245(a)(1), assaulting Mrs. Toledo with a deadly weapon, scissors, or with force likely to produce great bodily injury. Count 2 does not become a "serious felony" within the statutory scheme mandating an additional five-year prison term unless the defendant has suffered a prior serious felony conviction, which is not contested in the case at bench, and the current felony is also a "serious felony," which is contested. (Pen.Code, § 667(a)(1).) An assault with a deadly weapon is a serious felony if the defendant personally uses the weapon (§ 1192.7, former subd. (c)(23), now subd. (c)(24).)[15] Appellant contends that because the jury found the personal use allegation not true as to Count 1, that finding must be binding as to Count 2 and the additional five-year sentence for a serious felony must therefore be stricken.
Our Supreme Court has held that, where prior conviction allegations are bifurcated and the defendant waives his right to a jury trial thereon, the trial court can make a factual finding that defendant had personally used a weapon in committing the current offense and thus find the charged offense to be a serious felony under *651 section 1192.7, former subdivision (c)(24). (People v. Equarte (1986) 42 Cal.3d 456, 467, 229 Cal.Rptr. 116, 722 P.2d 890.) Pursuant to Equarte, supra, 42 Cal.3d 456, 467, 229 Cal.Rptr. 116, 722 P.2d 890, the trier of fact that decides the substantive offense (here, the jury) need not necessarily decide whether defendant committed a serious felony. (People v. Yarbrough (1997) 57 Cal.App.4th 469, 477, 67 Cal.Rptr.2d 227; cf. section 969f.)
Neither does the jury's finding that there was no "personal use" as to Count 1 necessarily bind the court as to Count 2.[16] While a jury may have found appellant did not personally use a deadly weapon, the scissors, when making an attempted terrorist threat, such a finding does not necessarily conflict with a finding that appellant did use the scissors when assaulting his wife with the scissors.
During their argument, appellant's wife told him she did not care if he destroyed the apartment, and she picked up a lamp in the bedroom and dropped it to the floor. Appellant then told her "You know, death is going to become you tonight. I am going to kill you." She stated she did not care, as if she had given up hope and "just do what you have to do." At his direction, she went into the front room, sat on the couch, and placed her hands underneath her legs. Only then did appellant walk away from her, and come back holding an object she could not identify, approaching within three feet of her with his hand over his shoulder. As appellant lowered the object toward her, the victim ducked. Appellant told her: "You don't want to die tonight, do you?"
After leaving the room and returning, appellant again approached his wife and in a rapid movement lowered the scissors downwards to her right upper shoulder, the right side of her neck, stopping only inches away from her. As the scissors were coming down, she leaned back on the couch and put up her feet to block the attack. She was afraid appellant was going to kill her. Appellant then said: "You don't want to die tonight, do you? You're not worth going to jail for."
There is thus evidence that at the time he made the terrorist threat that "You know, death is going to become you tonight. I am going to kill you," appellant was not holding the scissors. The record supports a finding that appellant later picked up the scissors and twice came at his wife with them, thus committing Count 2, the assault.
The trial court did not err in imposing the additional five-year term pursuant to sections 667(a)(1) and 1192.7, former subdivision (c)(23).

2. Attempted terrorist threat is a crime.
Appellant contends that there can be no crime of attempted terrorist threats.[17] Analogizing to attempted battery, which is not a crime (In re James M., supra, 9 Cal.3d 517, 522, 108 Cal.Rptr. 89, 510 P.2d 33; see also People v. Duens (1976) 64 Cal.App.3d 310, 134 Cal.Rptr. 341 [no crime of attempted assault with intent to commit rape]), he asserts that to criminalize the attempt would punish protected speech the Legislature chose not to punish and that section 422 is a specific statute to which the general provisions of section 664 do not apply.[18]

*652 a. Section 422.

Section 422 defines the crime of terrorist threats and, in January 1998 provided:
"Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison...."
"Section 422 was enacted as part of the 'California Street Terrorism Enforcement and Prevention Act' of 1988. (People v. Brooks (1994) 26 Cal.App.4th 142, 149 [31 Cal.Rptr.2d 283].) We have previously held that the section does not apply solely to street gang activity and may be applied to individuals. (In re Ge M. (1991) 226 Cal.App.3d 1519, 1523 [277 Cal.Rptr. 554].)" (People v. Dias (1997) 52 Cal. App.4th 46, 50-51, 60 Cal.Rptr.2d 443.)
"The genesis of the language in Penal Code section 422 is well known. In 1981, the California Supreme Court invalidated former section 422 as unconstitutionally vague. (People v. Mirmirani (1981) 30 Cal.3d 375 [178 Cal.Rptr. 792, 636 P.2d 1130].) The statute was repealed in 1987, and a substantially revised statute was enacted in 1988. (Stats.1987, ch. 828, § 28, p. 2587; Stats.1988, ch. 1256, § 4, pp. 4184-4185.) The relevant statutory language was adopted almost verbatim from United States v. Kelner (2d Cir.1976) 534 F.2d 1020[], a case which discussed the boundaries imposed by the First Amendment on the punishment of threats. (People v. Fisher (1993) 12 Cal.App.4th 1556, 1560 [15 Cal.Rptr.2d 889].)" (People v. Stanfield (1995) 32 Cal.App.4th 1152, 1159, 38 Cal.Rptr.2d 328.)
"Later federal cases applying and interpreting Kelner and Watts v. United States (1969) 394 U.S. 705 [89 S.Ct. 1399, 22 L.Ed.2d 664] (upon which Kelner relied) held that the conditional nature of a threat did not render it unpunishable. (People v. Brooks, supra, 26 Cal.App.4th at pp. 146-147 [31 Cal.Rptr.2d 283], and cases cited therein; see for example United States v. Schneider (7th Cir.1990) 910 F.2d 1569, 1570 [`Most threats are conditional; they are designed to accomplish something; the threatener hopes that they will accomplish it, so that he won't have to carry out the threats'].) In general, the federal courts after Kelner have concluded that not all threats to perform illegal acts are protected by the First Amendment, and a conditional threat may be culpable depending upon its context. (People v. Brooks, supra, 26 Cal.App.4th at p. 149 [31 Cal. Rptr.2d 283].)" (People v. Dias, supra, 52 Cal.App.4th 46, 51, 60 Cal.Rptr.2d 443, fn. omitted.) Indeed, following Dias, ibid., our Supreme Court in People v. Bolin (1998) 18 Cal.4th 297, 337-340, 75 Cal. Rptr.2d 412, 956 P.2d 374, disapproved People v. Brown (1993) 20 Cal.App.4th 1251, 1256, 25 Cal.Rptr.2d 76, the only California case to require an "unconditional" threat as an element of section 422.)

b. The nature of attempts.
Section 664 provides regarding attempts: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by *653 law for the punishment of those attempts...." The jury was instructed: "An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act down toward its commission, [¶] In determining whether such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the offense or of devising, obtaining or arranging the means for its commission is not sufficient to constitute an attempt. However, acts of a person who intends to commit a crime will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to commit that specific crime. These acts must be an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design."[19]
"An attempt to commit a crime, however, requires only a specific intent to commit it and a direct but ineffectual act done towards its commission, i.e., an overt ineffectual act which is beyond mere preparation yet short of actual commission of the crime. (People v. Siu, supra, 126 Cal. App.2d 41, 43 [271 P.2d 575]; People v. Valdez (1985) 175 Cal.App.3d 103, 108 [220 Cal.Rptr. 538].) A defendant can be convicted of the attempt to commit most crimes even though a factual impossibility prevented the commission of the crime itself. (People v. Valdez, supra, at pp. 108-109 [220 Cal.Rptr. 538].) Because of the `present ability' limitation in the statutory definition of assault, no assault is committed unless such present ability exists. (Ibid.) [¶] By contrast, in cases of ordinary attempt, the law imposes punishment where guilty intent is coupled with actions that would result in a crime but for the intervention of some fact or circumstance unknown to the defendant. (People v. Meyers (1963) 213 Cal.App.2d 518, 522-523 [28 Cal.Rptr. 753].)" (People v. Ross (1988) 205 Cal.App.3d 1548, 1554-1555, 253 Cal.Rptr. 178.)[20]

c. The crime of attempted terrorist threat can be distinguished from the rationale in James M. that proscribed prosecution of attempted assault in California.
The court in In re James M., supra, 9 Cal.3d 517, 521, 108 Cal.Rptr. 89, 510 P.2d 33, which concluded there is no crime of attempted assault in California,[21] nevertheless recognized the "it is apparent that the abstract concept of an attempted assault is not necessarily a logical absurdity." The court relied on two principal grounds in finding no crime of attempted assault in California. First, there was a "clear manifestation of legislative intent," *654 i.e., that the Legislature did not intend to punish assault unless there was a present ability to commit a battery. (Id. at p. 522, 108 Cal.Rptr. 89, 510 P.2d 33.) Second, the court relied on the "established rule of statutory construction that particular provisions will prevail over general provisions. Therefore, the legislative intent not to punish batteries attempted without present ability prevails over the general criminal attempt provisions of section 664."[22] (Ibid.)
It is these grounds that appellant urges in order to negate attempted terrorist threat as a crime. Terrorist threat, unlike assault and battery, was not a common law crime with its own implied history of legislative intention. Following the disapproval of former section 422 as unconstitutionally vague (People v. Mirmirani, supra, 30 Cal.3d 375, 178 Cal.Rptr. 792, 636 P.2d 1130), the California Legislature clearly intended to limit the current version of section 422 to specific speech that was not protected by the First Amendment, in order to comply with the United States Supreme Court's holding in Kelner, supra. In doing so, there is no indication that the Legislature in any way proscribed an attempt to commit section 422.
Nor are we persuaded by appellant's argument that section 422 is a specific statute to which the general provisions of section 664 do not apply.[23] Most crimes are more specific than section 664. Nonetheless, the absence of an element required in the completed crime does not necessarily negate an attempt. (See, e.g., People v. Kinsey (1995) 40 Cal.App.4th 1621, 1627-1628, 47 Cal.Rptr.2d 769 [holding that attempted injury upon a cohabitant (§ § 664/273.5, subd. (a)) does not require a "traumatic condition"].) As the Kinsey court noted, id. at page 1627, 47 Cal.Rptr.2d 769, "attempted murder does not require a death (People v. Singleton (1980) 112 Cal.App.3d 418, 169 Cal.Rptr. 333[ ]), attempted subornation of perjury does not require perjury (People v. Meaders (1983) 148 Cal.App.3d 1155 [197 Cal. Rptr. 1]), attempted detention and concealment of children does not require detention or concealment (People v. Milne (1882) 60 Cal. 71), and attempted drunk driving does not require driving (People v. Garcia (1989) 214 Cal.App.3d Supp. 1 [262 Cal.Rptr. 915])."
The principle appellant relies on, "`... that a specific statute prevails over a general one[,] applies only when the two sections cannot be reconciled. [Citations.]' [Citation.] If we can reasonably harmonize `[t]wo statutes dealing with the same subject,' then we must give `concurrent effect' to both, `even though one is specific and the other general. [Citations.]' [Citation.]" (Garcia v. McCutchen (1997) 16 Cal.4th 469, 478, 66 Cal.Rptr.2d 319, 940 P.2d 906.) Applying the law of attempt is consistent with the purpose of both statutes.
There are several elements defining the crime of terrorist threat. The threat must be "to commit a crime which will result in death or great bodily injury to another person." The perpetrator must have "specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out." The threat "on its face and under the circumstances in which it is made [must be] so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of *655 execution of the threat."[24] Finally, the threat must cause "that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety."
It is axiomatic that an attempt does not satisfy all of the elements of the crime in that the perpetrator's intent to commit the crime has been interrupted in some way. To adopt appellant's rationale would effectively abolish most attempts as criminal activity. The Legislature's desire to punish specific threats that cause sustained fear does not conflict with the purpose of section 664 to punish attempts to do so. We explain.
An attempted terrorist threat cannot occur absent the elements that make the statement a "threat." That is, the "threat" must be "to commit a crime which will result in death or great bodily injury to another person." The perpetrator must have "specific intent that the statement is to be taken as a threat, even if there is no intent of actually carrying it out." The threat must be "unequivocal, unconditional, immediate, and specific," as interpreted by the case law, and the statement must convey "a gravity of purpose and an immediate prospect of execution of the threat." Finally, the threat must be such as to cause a reasonable person so threatened to be in sustained fear for his or her own safety or for his or her immediate family's safety. Without those elements, the statement by the perpetrator is not a "threat." There can be no attempted threat without an identifiable and intelligible statement constituting a "threat."
However, an attempted terrorist threat can occur absent the conveyance of the threat to the intended victim and that person's reaction ("reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety") People v. Kinsey, supra, 40 Cal.App.4th at 1626-1627, 47 Cal.Rptr.2d 769, is instructive. Defendant in Kinsey was convicted of attempted injury upon a cohabitant (Pen.Code, §§ 664/273.5) and contended there could be no such crime. Penal Code section 273.5 then provided: "... Any person who willfully inflicts upon any person with whom he ... is cohabiting, or ... who is the mother ... of his ... child, corporal injury resulting in a traumatic condition, is guilty of a felony ..." Defendant acknowledged the crime could be attempted when no corporal injury occurred but contended that the element of "traumatic condition" was essential to either the crime or the attempt. The court disagreed.
Similarly, we disagree that an attempted terrorist threat cannot be a crime. If a threat as defined in the statute is made, with specific intent, but the maker fails in or is prevented from, conveying the threat to the prospective victim or the threat does not cause the intended victim "to be in sustained fear," although a reasonable person would have been, an attempted terrorist threat has nevertheless occurred. For example, circumstances where the victim is a person unable to understand the nature of the threat, either because of age or disability, do not bar prosecution for such threats, and indeed such victims as young children and the mentally disabled may be more in need of protection from the threat and potential violence. Neither does the victim's lack of sustained fear, like the lack of traumatic condition in Kinsey, bar prosecution of the attempted threat. In the case at bench, appellant approached his wife with specific threats of imminent death. Given the record before us, the only element of terrorist threat the jury might have found to be attempted but not completed was her testimony that she was not frightened by appellant's statements. The jury was entitled to find that a reasonable person would have been, thus Appellant was properly convicted of attempted terrorist threat.

*656 3. As applied to a crime punishing speech, the general provisions of section 66k are not constitutionally overbroad.

"`To succeed in a constitutional challenge based on asserted overbreadth, [a claimant] must demonstrate the statute inhibits a substantial amount of protected speech. (New York v. Ferber (1982) 458 U.S. 747, 768-769 [102 S.Ct. 3348, 3360-3361, 73 L.Ed.2d 1113, 1129-1130].) "[O]verbreadth ... must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." (Broadrick v. Oklahoma, supra, 413 U.S. [601] at p. 615 [93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)]) We are bound, if possible, to construe a statute in a fashion that renders it constitutional. (See People v. Hansel (1992) 1 Cal.4th 1211, 1219 [4 Cal.Rptr.2d 888, 824 P.2d 694] ["`it is our duty to uphold a statute unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity. [Citations.]' "].)' (In re M.S., supra, 10 Cal.4th at pp. 709-710 [42 Cal.Rptr.2d 355, 896 P.2d 1365].)" (People v. Borrelli (2000) 77 Cal.App.4th 703, 718, 91 Cal.Rptr.2d 851.)
In People v. Gudger (1994) 29 Cal. App.4th 310, 34 Cal.Rptr.2d 510, this Division upheld a challenge to section 76 on the basis of overbreadth.[25] Defendant in Gudger, id. at pages 317-318, 34 Cal. Rptr.2d 510, had focused on section 422 as a related statute which this court described as proscribing terrorist threats and containing "certain defining language which has ensured the constitutionality of that statute...." We see no reason to change our view that section 422 withstands a constitutional challenge for overbreadth.
Appellant nevertheless challenges the application of the attempt statute to section 422 as overbroad. Section 664 requires "specific intent to commit [the crime] and a direct but ineffectual act towards its commission." (People v. Ross, supra, 205 Cal.App.3d 1548, 1554, 253 Cal. Rptr. 178.) Here, the specific intent must be to commit the crime, terrorist threat, which our Legislature has drawn narrowly with the First Amendment in mind, in light of Kelner, supra. As explained above, absent a "threat," there can be no attempted threat; but there can be an attempted threat without sustained fear by the intended victim or understanding by that person of the nature of the threat. We find no theoretical barrier to upholding attempted terrorist threat against an overbreadth challenge.

DISPOSITION
The judgment of conviction is affirmed.
BOREN, P.J., and MALLANO, J.[*], concur.
NOTES
[1] The jury acquitted appellant on a third count, assault with a deadly weapon and by means of force likely to produce great bodily injury on Mary Guerra and Joanne Ortega Toledo (Pen.Code, § 245(a)(1), based on appellant's alleged throwing of an iron at the women) and found appellant not guilty of the lesser crime of simple assault on that count. In addition, the jury found not true an allegation that appellant personally used a deadly and dangerous weapon, scissors, in the commission of the attempted terrorist threats. All further statutory references are to the Penal Code.
[2] At trial, Mrs. Toledo's testimony was at great variance from her statements to the deputy the night of the event, which are set forth infra in the deputy's testimony. Her statements to the deputy established the subject crimes. At trial, as set forth herein, she downplayed appellant's conduct and in part blamed herself. Outside the presence of the jury, in the middle of her direct testimony, the court told Mrs. Toledo that it appeared she was not "being completely truthful and honest. You're being evasive and perhaps untruthful." The court advised her that her behavior is "not uncommon" in testifying about one's spouse but that she should think about coming in and telling the truth.
[3] Their daughter was with Mrs. Toledo's mother that evening.
[4] She testified that, although she locked the door to take a shower and not to get away from appellant, she never took that shower and instead threw the lamp because "sometimes I like to fight back." According to her testimony, she did not feel threatened by him and wanted to continue to argue with him to make a point.
[5] At trial, she was unsure what he had picked up, but it could have been a pair of her sewing scissors.
[6] Mrs. Toledo testified that she did not take her shoes because they were in the bathroom and did not take her keys because she "wasn't planning on going anywhere."
[7] At that point, when they were in the house, they heard a bang. It appeared that appellant was in the window with the screen out. He seemed to be getting "really pissed off." Mrs. Toledo did not see him throw anything, but did hear something hit the stairwell. The next day, her clothes iron was gone. Mary told her they found some pieces of an iron on the sidewalk.
[8] She talked to appellant over the weekend. He said he had come home, picked up his clothes, and left.
[9] At trial, she specifically denied that appellant told her "You know, death is going to become you tonight. I am going to kill you." and she did not recall if she had told that to the deputy. She also denied that appellant told her "You don't want to die" or. regarding their neighbors, "If you go over there, I'll kill them and everybody." Furthermore, she denied he said "If you are harboring her, something is going to happen."
[10] Mary did not remember if she talked to appellant directly, or if he left a message.
[11] According to Mrs. Guerra, they were either at the bottom of the stairwell or running up the stairwell, but not inside her apartment, when she heard the bang.
[12] The deputy took the scissors identified by Mrs. Toledo.
[13] When defense counsel questioned the deputy about the lack of that exact statement in the arrest report, a hearing was held outside the presence of the jury. The deputy had written that the victim said she took the suspect's death threats seriously based on his attempted murder conviction and criminal record. The report continued that he had five potential felony strikes as well as a long criminal history. The court was going to allow in testimony regarding statements in the report; because there did not appear to be an attempted murder conviction, the prosecutor was satisfied to show the report contained that the victim was fearful for a reason. The deputy then testified that the report stated that the victim had mentioned she took the suspect's death threats seriously. On redirect, the prosecutor established that the victim gave the deputy a reason for taking the threats seriously and he found it to be a legitimate reason and had no question that that would cause fear in the average person.
[14] Mrs. Toledo was aware of the information in Deputy Henstrand's report and tried to counteract it. She said she covered her face because it was a big game being played, but did not know why she ducked or covered her face. She admitted she sat on her hands at appellant's instruction. Mrs. Toledo also stated that appellant was probably correct when he told her he feels she puts other things and other people ahead of him and that she does not love him enough.
[15] The amended complaint alleged regarding Count 2: "`NOTICE: The above offense is a serious felony within the meaning of Penal Code section 1192.7(c)(23) in that the defendants) personally used a dangerous and deadly weapon.'" The same allegation accompanied Count 3. Personal use of a deadly weapon was part of the Count 1 allegation, which added that said use within the meaning of Penal Code Section 12022(b)(1) caused "the above offense to be a serious felony within the meaning of Penal Code section 1192.7(c)(23.)" The jury found the use allegation in Count 1 not to be true. As to all three counts, a prior conviction of section 245(a)(1) on February 2, 1991, was alleged pursuant to sections 667(b) through (i); 1170.12(a) through (d) and 667(b) through (i); and section 1203(e)(4). Moreover, as to Counts 2 and 3, a prior conviction of assault with a firearm on February 8, 1991, was alleged as a prior serious felony within the meaning of section 667(a)(1).
[16] In People v. Equarte, supra, 42 Cal.3d 456, 467, 229 Cal.Rptr. 116, 722 P.2d 890, the jury had not explicitly found that defendant "personally used" the weapon. Our Supreme Court held that on the evidence before it, the trial court in the bifurcated proceeding could properly find that the prosecution had proved defendant's "personal use" of the weapon and observed in Equarte that "indeed, the record leaves no doubt on this factual point."
[17] Appellant first raised this issue at the time of sentencing. The trial court was critical of counsel's failure to raise the issue earlier, e.g., during the discussion of jury instructions and attempted 422 as a lesser offense.
[18] Appellant also analogizes to attempted involuntary manslaughter, which has been held not to be a crime in California (People v. Johnson (1996) 51 Cal.App.4th 1329, 1332, 59 Cal.Rptr.2d 798.) However, the Johnson court referred to "the. internally contradictory premise that one can intend to commit an unintentional killing. Since the essential premise posits a manifest impossibility, there is no such crime as attempted involuntary manslaughter. (People v. Broussard (1977) 76 Cal.App.3d 193, 197 [142 Cal.Rptr. 664].)" Terrorist threats require specific intent, so that rationale would not apply in the case at bench.
[19] Furthermore, following an instruction on murder (as the threatened crime), the jury was instructed: "in the crime charged in Count 1, a violation of Penal Code section 422, making a terrorist threat or a violation of Penal Code section 664 and 422, attempted making of a terrorist threat, which is a lesser crime thereto, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists the crime to which it relates is not committed."
[20] The court in People v. Ross, supra, 205 Cal.App.3d 1548, 1555, 253 Cal.Rptr. 178, held "Defendant argues that factual impossibility is not in issue and that the crime of attempted false imprisonment, similar to the crime of assault, requires actual false imprisonment. He argues that at best, there was an ineffectual act towards the commission of the target offense, this because there was no evidence that defendant placed the notes on the cars or remained in a position to observe the effect of his notes. We disagree."
[21] Other states differ on whether attempted assault is a crime. (See, e.g., cases cited in In re James M., supra, 9 Cal.3d 517, 521, 108 Cal.Rptr. 89, 510 P.2d 33; see also People v. Jones (1993) 443 Mich. 88, 96-100, 504 N.W.2d 158; State v. May (1983) 137 Ariz. 183, 186 [669 P.2d 616, 619] [crime of assault by intentionally placing another person in reasonable apprehension of imminent physical injury].)
[22] The James M. court also foresaw "serious pragmatic difficulties if attempted assault were judicially established as a punishable crime.... Juries should not be required to engage in fruitless metaphysical speculation as to differing degrees of proximity between an assault and a general attempt, nor as to the logical possibility of attempting to commit any crime of assault, either simple or aggravated, the basic nature of which is an attempt in itself." (9 Cal.3d 517, 522, 108 Cal.Rptr. 89, 510 P.2d 33.)
[23] Appellant refers to Woody Allen's inept attempt to rob a bank with a poorly written note demanding "Give me your money. I have a gub."
[24] Section 422, as amended by Stats. 1998, c. 825, now also provides that the statement be "made verbally, in writing, or by means of an electronic communication device." The threats in the case at bench occurred in January 1998.
[25] Section 76 punishes every person who "knowingly and willingly threatens the life of, or threatens serious bodily harm to, any elected public official ... exempt appointee of the Governor, [or] judge ... with the specific intent that the statement is to be taken as a threat, and the apparent ability to carry out that threat by any means
[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.