[No. B006297. Second Dist., Div. Seven. Nov. 27, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGELIO VALDEZ, Defendant and Appellant.

**106**

## COUNSEL

Frank Morales for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert R. Anderson, Supervising Deputy Attorney General, and William H. Davis, Jr., Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Rogelio Valdez appeals the judgment entered following a court trial in which he was found guilty of assault with a firearm (Pen. Code, § 245, subd. (a)(2)) with a true finding that appellant personally used a firearm (Pen. Code, § 12022.5). He was sentenced to four years in state prison. He contends: "There is no substantial evidence to prove defendant aimed at, or intended to injure, the victim" and "[t]here is no substantial evidence to prove that defendant had the present ability to injure the victim." We reject both contentions and affirm the conviction.

### FACTS AND PROCEEDINGS BELOW

The evidence, viewed in the light most favorable to the judgment (*People v. Brock* (1985) 38 Cal.3d 180, 198 [211 Cal.Rptr. 122, 695 P.2d 209]), established that at approximately 4:40 a.m. on January 13, 1984, Kenneth Eugene McKinley, an employee of Thrifty Oil Company, a self-serve gasoline station in Huntington Park, was at the cashier's window when appellant gave him $4 for gasoline. After appellant pumped gasoline worth $3.99, he returned to McKinley and in Spanish said something about "cinco." McKinley motioned to him to return to the pump. Appellant pumped another penny's worth of gasoline, and again returned to the window insisting that he had given McKinley "cinco dollars." McKinley denied he had been given that much money and both men began yelling. Appellant raised his jacket and McKinley saw a "45 type pistol" in appellant's belt.

Upon observing the pistol, McKinley moved to appellant's left and away from the front of the cashier's window where there was an opening. After appellant pointed the pistol in McKinley's direction, McKinley called the police on the telephone immediately behind him and about ten feet from where appellant was standing.

While McKinley was using the telephone, he heard three shots and the sound of the impact on the window. When the shots were fired, McKinley

did not know where appellant was or who fired the shots. Thereafter, McKinley did see appellant jump into his vehicle and drive away.

Mona Lisa Salazar, an employee of a Jack-in-the-Box restaurant across the street from the gasoline station, heard a gun shot and saw a man standing approximately four feet from the cashier's window. The man's arm was extended and he was holding a gun. The man drove away in a white Maverick pursued by City of Vernon Police Officer Ronald Olson, who happened to be at the Jack-in-the-Box restaurant at the time of the shooting.

Officer Olson followed the Maverick and arrested appellant, the sole occupant of the vehicle. A loaded .380 Barretta automatic with two rounds in the clip and one in the chamber was found in the Maverick. A subsequent test established appellant had recently fired a firearm.

When later conducting an investigation of the shooting, Huntington Park Police Officer Jonathan Nerlinger saw three widely spaced chest high "puncture marks where projectiles had struck the bullet proof glass where the cashier [McKinley] sits behind." He also described the glass as "bullet resistant," and observed .380 caliber shell casings "approximately 15 feet south of the cashier's window."

In defense, appellant contended he became angry because McKinley "was not waiting" on him and instead was talking on the telephone. He admitted firing three shots but claimed McKinley was not in his line of fire.

### DISCUSSION

### I. EVIDENCE SUFFICIENT TO SUPPORT JUDGMENT

 Appellant's contention there is no substantial evidence to establish appellant aimed at or intended to injure McKinley is meritless. Here, the trier of fact expressly found the trajectory of the bullets fired from anywhere near where the shell casings were recovered would reasonably continue to the area where McKinley was located at the time of the shooting. Moreover, even had the trier of fact accepted appellant's self-serving testimony, the evidence would be sufficient for assault. "Although reckless conduct alone does not constitute a sufficient basis for assault or for battery even if the assault results in an injury to another, 'when an act inherently dangerous to others is committed with a conscious disregard of human life and safety, the act transcends recklessness, and the intent to commit the battery is presumed; the law cannot tolerate a deliberate and conscious disregard of human safety.'" (*People* v. *Martinez* (1977) 75 Cal.App.3d 859, 863 [142 Cal.Rptr. 515].) Even assuming appellant intended to fire into the

booth, but not at McKinley, that is something far different from a shot fired upward as happened in *People* v. *Carmen* (1951) 36 Cal.2d 768, 775 [288 P.2d 281].

## II. APPELLANT SATISFIED "PRESENT ABILITY" ELEMENT OF CRIME OF ASSAULT EVEN THOUGH VICTIM WAS BEHIND BULLETPROOF GLASS

 Appellant's contention there is insufficient evidence to establish he had the present ability to injure McKinley presents an issue of first impression in California. It also is a genre of issue which has provoked considerable academic interest over the years.[1] Is the "present ability" element of the crime of assault satisfied where some outside circumstance unknown to the defendant makes it impossible for the chosen means of attack to actually inflict injury on the victim? Or, more specific to the facts of this case, does a man who fires a loaded gun at another have a "present ability" to inflict injury where the victim is behind a bulletproof window?

To answer this question we must inquire into the meaning and function of the "present ability" element in California's criminal assault statute.

### A. *Conflicting Constructions of Present Ability and Factual Impossibility*

Appellant was convicted of violating Penal Code section 245, subdivision (a)(1)—assault with a deadly weapon. An assault, in turn, is defined in section 240 as "an unlawful attempt, *coupled with a present ability,* to commit a violent injury on the person of another." (Pen. Code, § 240, italics added.)

Without the "present ability" element, every attempt to commit violent injury would be a criminal assault. An attempt only requires a specific intent—in this instance the intent to injure—and an overt, ineffectual act which is beyond "mere preparation" yet short of actual commission of the crime. (1 Witkin, Cal. Crimes (1963) §§ 93, 96-98, and cases cited therein.)

 There is ample authority a defendant can be convicted of the attempt to commit most crimes even though it was *factually impossible* for him to

---

[1]Law review articles touching on this issue include (1935) 26 J. Crim. L. & Criminology 129; (1945) 6 La. L.Rev. 294; (1951) 30 Tex. L.Rev. 120; (1960) 27 Brooklyn L.Rev. 157; (1960) 13 Okla. L.Rev. 61; (1961) 25 Albany L.Rev. 150; (1961) 15 Ark. L.Rev.; (1965) Jud. Rev. 137; Elkind, *Impossibility in Criminal Attempts: A Theorist's Headache* (1968) 54 Va. L.Rev. 20; (1973) Smith, 123 New L. J. 882; Note (1974) 25 Hastings L.Rev. 657; (1976) 39 Mod. L.Rev. 55; (1983) Thornton, (1983) 25 Crim. L. J. 294; and (1984) Hogan, Crim. L.Rev. 584. See also, Perkins on Criminal Law (1969) pp. 118-122, 566-572.

have committed the crime itself. (1 Witkin, Cal. Crimes, *supra,* §§ 99-103, and cases cited therein.) ▪▪▪ Thus, if the crime of assault required only the two usual elements of an ordinary attempt, appellant's guilt would be clear even though his gun was incapable of shooting through the bulletproof glass.

But the crime of assault *does* include the additional element of "present ability." At first blush this implies factual impossibility would negate one element of the crime. As Witkin points out: "An attempt may sometimes be committed even though the means *or circumstances* make it impossible to consummate the crime . . . . But in states like California, which have statutes with the 'present ability' limitation . . ., no assault is committed unless such ability exists." (1 Witkin, *supra,* Cal. Crimes, § 257, italics added.) Thus, Witkin appears to equate "ability" with "possibility." If it is impossible to do something one lacks the ability to do it. Consequently, if it is impossible to inflict injury the defendant lacks the *ability* to do so and cannot be guilty of the crime of assault under California law.

Another California commentator, on the other hand, appears to analyze the "present ability" element somewhat differently. In Fricke and Alarcon's California Criminal Law (11th ed. 1977) at page 184, it is argued:

"The 'present ability' referred to in the definition of assault relates *solely to the ability of the person* attempting the unlawful injury and does not refer to the fact that, by reason of some fact or condition not controlled by the defendant, the intended injury cannot be inflicted. If one person rush at another in an attempt to strike him but is prevented from carrying out his intention by being seized by a third person or by the intended victim; or *if the person fired at were protected by a bullet proof vest* or if the cartridge misfired or if the defendant slipped and fell and the gun were discharged into the ground, *there would still be the present ability* even though the attempt was unsuccessful. (*People* v. *Yslas,* 27 Cal.App. [*sic*] 630.*)" (Italics added.)

Clearly, if the Fricke and Alarcon treatise were precedent, the precise question posed in this case would have been resolved. Unfortunately, neither the Supreme Court opinion it relies on—*People* v. *Yslas*—nor any other California decision we have been able to find actually mentions the effect of bulletproof vests or bulletproof windows or bulletproof anythings on the perpetrator's "present ability" to inflict injury. (*Yslas* itself was decided in 1865 which may account for the omission.) Indeed *Yslas* and these other decisions did not involve situations where external circumstances made it

---

*The correct cite is *People* v. *Yslas* (1865) 27 Cal. 630.

*impossible* to inflict injury. They were cases where because of these external factors injury *did not* occur but not ones where injury *could never* occur. In *Yslas,* for instance, injury was not inflicted because the victim ran away and hid from a charging assailant. Similarly, in *People* v. *Lee Kong* (1892) 95 Cal. 666 [30 P. 800] the defendant shot at a hole in the roof where he assumed his intended victim was located when, in fact, the victim was elsewhere on the roof.

B. *California Law Requires Defendant Have Objective "Present Ability" to Injure*

This would be an easier case if California had followed the many jurisdictions which have moved to what Perkins characterizes as the "logical position" on the definition of the present ability element of assault. (Perkins on Criminal Law, *op. cit. supra,* p. 121.) Under this modern view, the element of "present ability" is defined by a subjective test—did the defendant or his intended victim believe he had the ability to inflict injury at the time he made his attempt. In these jurisdictions, either by express statutory language or judicial interpretation, this element has come to require only an *"apparent* present ability" instead of *objective* present ability. (*Id.,* pp. 120-122, and cases cited therein.) Whatever might be said about appellant's actual "present ability" to injure his intended victim he clearly entertained a subjective belief he could when he fired off the three shots from his handgun. Thus, in any state which only required "apparent present ability," appellant would be guilty of assault.

■ California, on the other hand, has been committed to an "old-fashioned" version of criminal assault for at least 93 years. The three essential elements—including "present ability"—have remained unchanged since the original statute was enacted in 1856. And if there were any ambiguity about whether this law meant actual rather than apparent "present ability" it was removed by the California Supreme Court in 1892. In *People* v. *Lee Kong, supra,* 95 Cal. 666, 669, the court held:

"[W]e cannot endorse those authorities, principally English, which hold that an assault may be committed by a person pointing in a threatening manner an unloaded gun at another; and this, too, regardless of the fact whether the party holding the gun thought it was loaded, or whether the party at whom it was menacingly pointed was thereby placed in great fear. Under our statute it cannot be said that a person with an unloaded gun would have the present ability to inflict an injury upon another many yards distant, however apparent and unlawful his attempt to do so might be . . . ." As recently as 1983, the California Supreme Court reconfirmed this state's dedication to a requirement of *actual* not merely *apparent* present ability.

(*People* v. *Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520], (quoting with approval from *People* v. *Yslas, supra,* 27 Cal. 630).)

 Consistent with this interpretation, California courts have held attempting to shoot someone with an unloaded gun does not constitute the crime of assault because the perpetrator lacks the "present ability" to inflict injury. (*People* v. *Sylva* (1904) 143 Cal. 62, 64 [76 P. 814]; *People* v. *Mosqueda* (1970) 5 Cal.App.3d 540 [85 Cal.Rptr. 346].) Nor, obviously does threatening someone with a toy gun or candy pistol satisfy this element. (*People* v. *Vaiza* (1966) 244 Cal.App.2d 121 [52 Cal.Rptr. 733].) On the other hand, a defendant has been held to have a present ability to injure where he is only a moment away from being able to fire his gun. (*People* v. *Simpson* (1933) 134 Cal.App. 646, 650 [25 P.2d 1008] [gun's magazine was loaded but no bullet in firing chamber]; *People* v. *Ranson* (1974) 40 Cal.App.3d 317, 321 [114 Cal.Rptr. 874] [gun jammed when defendant tried to fire first round but he possessed knowledge and ability to quickly cure the jam, *even though he had not done so at time attempt ended.*].)

C. *"Present Ability" Element Refers to Defendant's Objective Proximity to Infliction of Injury and Is Not Nullified by Intended Victim's Successful Attempts to Avoid or Prevent Injury Even Where Those Attempts Render Injury "Impossible"*

 The term "ability" is defined as "The quality of being able to do something; physical, mental, financial or legal power to perform . . . . [In contrast with synonyms like capacity, faculty, etc.] *(a)bility* is the power, mental or physical, to do something, and usually implies doing it well." (American Heritage Dict. (1976) p. 3.) Another leading dictionary defines "ability" as "the quality or state of being able: physical, mental, or legal power to perform: competence in doing . . . ." (Webster's Third New Internat. Dict. (1961) p. 3.)

 These definitions connote a personal attribute—what a given individual has the capacity to do in contrast with those who lack this quality— not an environmental factor. Thus, it appears quite different in character from the notion of "impossibility" which is defined as "[t]he condition or quality of being impossible" which, in turn, is defined as "[n]ot capable of existing or happening." Since these are such different concepts one would have expected the Legislature to use or add the element "present possibility" not just "present ability" if it indeed desired to excuse defendants who fail to injure their victims only because the victim's actions or external conditions make it "impossible" for him to succeed despite his best efforts.

■ The real function of this "present ability" element in common law assault as incorporated in the California statute is to require the perpetrator to have gone beyond the minimal steps involved in an attempt. That is, he must have come closer to inflicting injury than he would have to in order to satisfy the elements of an attempt. "The emphasis . . . was upon the very strict interpretation of 'proximity' in the law of assault. . . . (I)t has been said: 'This is a clear recognition of the principle that an attempt, or the overt act which is the initial stage thereof, does not require a physical act in the way of an assault or advance upon the person of the intended victim.' Therefore, since one may be guilty of an attempt to commit murder or rape, for example, without coming close enough to his intended victim to commit an assault, it follows that the attempt is a lesser included offense in a prosecution for an aggravated assault of that nature." (Perkins on Criminal Law, *supra,* at p. 119.)

■ Thus, because of the "present ability" element of the offense, to be guilty of assault a defendant must have maneuvered himself into such a location and equipped himself with sufficient means that he appears to be able to strike immediately at his intended victim. (Thus, the emphasis is on the word "present" as much as the word "ability.") The policy justification is apparent. When someone has gone this far he is a greater and more imminent threat to his victim and to the public peace than if he is at an earlier stage of an attempted crime. ■ In contrast, a defendant can be found guilty of an ordinary attempt even if intercepted on his way to a location which would be within striking distance of his intended victim (e.g., *People v. Stites* (1888) 75 Cal. 570 [17 P. 693]) or while assembling the means to attack this target (e.g., *People v. Lanzit* (1925) 70 Cal.App. 498 [233 P. 816]).

■ Nothing suggests this "present ability" element was incorporated into the common law to excuse defendants from the crime of assault where they have acquired the means to inflict serious injury and positioned themselves within striking distance merely because, unknown to them, external circumstances doom their attack to failure. This proposition would make even less sense where a defendant has actually launched his attack—as in the present case—but failed only because of some unforeseen circumstance which made success impossible. Nor have we found any cases under the California law which compel this result. The decisions holding a defendant lacks "present ability" when he tries to shoot someone with an unloaded gun or a toy pistol do not support any such proposition. In those situations, the defendant has simply failed to equip himself with the personal means to inflict serious injury even if he thought he had.

In the instant case, appellant clearly equipped himself with the means to inflict serious injury. Not only was the gun loaded, it proved fully opera-

tional when appellant fired off three rounds in the direction of the victim. Moreover, appellant also was easily within striking distance, standing less than ten feet from his intended victim in the cashier's cage. So given the function of the "present ability" element—to insure the defendant has reached the point where he is able to strike immediately at his intended victim—we have no difficulty finding what appellant did indeed satisfied this element. Not only had appellant reached the point where he could strike, he in fact struck—firing three bullets at his intended victim, the cashier.

Once a defendant has attained the means and location to strike immediately he has the "present ability to injure." The fact an intended victim takes effective steps to avoid injury has never been held to negate this "present ability." For example, the intended victim in *People* v. *Yslas,* ran away and hid from the hatchet-wielding attacker who nevertheless was found guilty of assault. In effect, the gas station cashier's act of taking refuge in a bulletproof cage is merely another form of seeking to avoid injury. The fact it is more effective than most other actions taken by those threatened with battery is no reason to find it immunizes attackers from being found guilty of assault. Nor is the fact it is a defensive action taken before the attack is launched. Nor is the fact, if true, that it is a guaranteed 100 percent effective defense against the attack. None of this affects the intent or unlawful acts of the defendant. The latter intended and did the same things as if the victim had done nothing to avoid injury. Thus, his culpability is the same. The defendant also intended and did the same things—and is equally culpable—as if the intended victim (or persons on his behalf) took temporary or ineffectual—rather than permanent, absolutely effective—defensive measures. In all these instances, a defendant would have a personal "present ability" to injure his intended victim. By one measure or another the victim or others may, in effect, make it *impossible* for the defendant to succeed. This would not, however, eliminate the defendant's "present ability" in the sense required by the assault statute. That is, the victim's avoidance or preventive measures would not alter the fact the defendant had acquired the means and maneuvered into a location to immediately injure his victim.

Another reason suggests the Legislature did not intend impossibility in the form of an impenetrable defense to negate the existence of a defendant's "present ability" to injure. ▮ ▮▮ ▮ ▮ In these situations, factual *impossibility* is only a relative term.[2] What appears impenetrable to one

---

[2] We find a broader principle applicable to this case and thus need not delve into certain special circumstances present here which might have dissolved appellant's impossibility defense even were an impenetrable bulletproof barrier considered to negate his "present ability" to assault the station attendant. Testimony indicated an opening existed in the bulletproof glass. Conceivably appellant could have shot through that opening from where he was standing and hit the attendant. Indeed he could have been attempting to do so when he

attack may be pierced by a later similar attack. For instance, had appellant shot all three bullets into the exact same spot the final missile indeed might have penetrated the bulletproof glass and injured the intended victim. Or had he used a more powerful gun or stood a bit closer or at a different angle his shots may have pierced the glass. Or had the particular glass contained a manufacturing defect it may have failed to fulfill its function of preventing the bullet from reaching the victim. It seems unlikely the Legislature intended to hold assailants guiltless of the crime of assault unless and until they manage to figure a way around the defenses their targets have devised. This would give attackers as many "free rides" as it took to turn the impenetrable into the penetrable and prove the impossible is possible, after all.

For these reasons of statutory construction and public policy, we hold a defendant can commit the crime of assault even though his intended victim, unknown to him, has thrown up an apparently impervious defense. We need not reach and do not decide the issue presented by a would-be assailant who *knowing* his victim is behind a bulletproof barrier fires merely as a joke or to release his frustrations. But this is far different from the assailant who lacks this knowledge or even one who knows of the bulletproof barrier yet blazes away like some perverted Don Quixote in the *hope* he might realize his impossible dream—and the victim's worst nightmare.

### DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Thompson, J., concurred.

---

fired the three bullets. Or, failing that, a couple of long strides might have put him in a position to shoot his victim through the opening. So shooting the cashier when he was behind this incomplete bulletproof shield may not have been any more "impossible" than if he had retreated around the corner of the building a split second before the bullets were fired. However, we hold a defendant's "present ability" within the meaning of the assault statute does not turn on whether the shield is complete or has an opening. Consequently, we need not make a finding whether the record supports a conclusion this particular bulletproof window had an "Achilles heel."