Filed 2/4/21  P. v. Loya CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL LOYA,<br><br>    Defendant and Appellant. | E074881<br><br>(Super. Ct. No. RIF1702677)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Steven G. Counelis, Judge.  Affirmed.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.

## INTRODUCTION

Defendant and appellant, Daniel Loya, appeals from the judgment entered following jury convictions for two counts of assault on his neighbors with a deadly weapon, a hatchet (Pen. Code, § 245, subd. (a)(1);[1] counts 1 & 2), and two counts of making criminal threats to chop off his neighbors' heads (§ 422; counts 3 & 4). The trial court sentenced defendant to three years in prison.

Defendant contends there was insufficient evidence to support his convictions for assault with a deadly weapon, and the trial court erred in not staying sentencing on his criminal threats convictions under section 654. We disagree as to both contentions, and affirm the judgment.

## II.

## FACTS

For many years S.W. and his adult son, M.W., lived in a house behind defendant's home. The two properties are separated by a block wall, which is six feet high on S.W.'s side and six and a half feet high on defendant's side. Next to the wall on S.W.'s property is a metal pole with two security cameras on two sides of the pole. One of the cameras shows the side of the wall and the other camera shows the back of S.W.'s property along

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

the wall. There is also a rotary camera that hangs from the top of the pole. The camera turns 360 degrees, capturing the side of the wall.

S.W. installed the cameras and wall for the safety of his family because he had had so many problems and altercations with defendant over the years. Defendant was confrontational and argumentative, and had anger issues. He had yelled, screamed, cursed, and threatened S.W. Defendant initiated verbal confrontations with S.W. a couple of times a month, broke lights around S.W.'s house, and wore a ski mask around the neighborhood. Defendant had entered S.W.'s property uninvited. S.W. had called the police on defendant "a hundred times." S.W., M.W., and several of their neighbors testified they believed the neighborhood would be a better place if defendant were gone.

A. *The Charged Offenses*

While at home in the back of S.W.'s home during the afternoon of June 18, 2017, S.W. and M.W. heard the sound of metal striking metal. They went outside to investigate. S.W. and M.W. climbed up on chairs in their backyard next to the wall, and peered over the wall separating their property from defendant's. The wall was about chest height when they stood on the chairs. S.W. and M.W. were able to rest their arms on the top of the wall.

When S.W. and M.W. looked over the wall, they saw defendant holding a hatchet. S.W. testified that the sound he had heard of metal striking metal was consistent with someone hitting his security pole with a hatchet. S.W. confronted defendant about the matter and defendant admitted he had hit the pole with the hatchet. Defendant was three

to four feet from the wall. S.W. told defendant not to damage S.W.'s property. Defendant replied, "'You're done, the both of you, I'm going to chop your F'ing head off.'" S.W. testified defendant sounded "[v]ery, very, very angry." His demeanor was "very hostile, very upset." He was holding the hatchet at his side and then raised it up above his head, as if he were going to chop at someone with it. S.W. and M.W. were fearful. They did not know what defendant was going to do and believed he was serious about his threat. S.W. testified he "fully believed" defendant would follow through with his threat at that moment.

Defendant then turned around and walked for a few minutes back toward his house. When he was close to his front door, S.W. asked defendant "'what is going on?'" Defendant replied, "'You know what's going on, you're talking about my family.'" S.W. told defendant he had no idea what defendant was talking about. Defendant suddenly turned around and ran towards S.W. and M.W. with the hatchet. S.W. testified he "was thinking [defendant] was really going to chop our heads off." S.W. "actually believed he was going to carry out his threat." S.W. believed this based on what defendant had recently said and because defendant was running full speed toward S.W. and M.W. with the hatchet raised up. S.W. testified he "didn't see the wall as something that would stop [defendant] from coming over it."

As defendant charged towards S.W. and M.W., they ducked behind the wall and quickly went inside their house, locked the door, and called the police. S.W. testified that when S.W. and M.W. ducked behind the wall, defendant was "[n]o more than 10, 15 feet

at best." S.W. jumped down off the chair and went inside his house because he "felt like [defendant] was actually going to hit us with the hatchet." S.W. testified he "thought he might come over the wall after us."

M.W. testified he was also very scared at that point. He did not know what was going to happen. He grabbed his dad out of fear for their safety, and said, "'let's get out of here.'" M.W. testified he believed defendant would carry out his threat. After M.W. and S.W. ran inside their house, M.W. stood by the back door and looked out the door window to make sure defendant was not coming over the wall. S.W. later checked the security cameras and pole. One of the cameras had been damaged and there was a small ding in the side of the pole. One of the cameras captured the incident.

Police Officer Caton responded to S.W.'s 911 call. S.W. and M.W. both appeared frightened. S.W. testified he still feared defendant would carry out his threat. Officer Caton testified he found an indented scratch on the metal pole. The scratch was consistent with a hatchet. The scratch was one and a half to two feet above the wall on the pole. Officer Caton recorded the security video of the incident on his phone. The police took still photographs from the video. S.W. later lost the video when his computer hard drive went out. In addition, Officer Caton was unable to locate the video. Officer Caton testified the video was consistent with S.W. and M.W.'s version of the incident. The video showed defendant stopping about 15 feet from the wall. The video did not show defendant try to climb over the wall or get on S.W.'s property. During Officer Caton's interview of defendant, defendant said he hit the pole with his hatchet because he

heard interference on his television, which he thought was coming from S.W.'s cameras. Defendant was trying to stop the interference from the cameras. Another officer found the hatchet in defendant's living room.

B. *Other Uncharged Offenses*

During the afternoon of August 30, 2016, about a year before the charged offenses, defendant stood in the street in front of his house and yelled threats at a man and the man's wife and mother, who lived across the street. When the man confronted defendant, defendant went inside his house, and came back outside holding a knife in the air, yelling, "'I'm going to F'ing kill you.'" When defendant saw the man's wife calling the police, defendant went inside.

In April 2019, after charges were filed in the instant case and about three months before defendant's trial, defendant, who was speeding down the street, almost ran over C.J. and her brother-in-law while they were chatting by her parked car. They jumped onto the sidewalk to avoid being hit. Defendant stopped in front of them and began yelling at them. Defendant then got out of his car and yelled in C.J.'s brother-in-law's face. C.J.'s brother-in-law went inside his house. Defendant began yelling at C.J. C.J.'s brother-in-law returned with a bat, told defendant to leave, and hit him with the bat. Defendant ran to the driver's side of his car. C.J. was then able to get in her car. She drove away and called the police.

III.

SUFFICIENCY OF EVIDENCE OF ASSAULT

Defendant contends there was insufficient evidence to support his conviction for assault with a deadly weapon (§ 245, subd. (a)(1)) because the People failed to establish that he had a present ability to commit an assault.

A. *Standard of Review*

In addressing defendant's challenge to the sufficiency of the evidence supporting his assault convictions, this court "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence-evidence that is reasonable, credible and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

B. *Evidence Required to Prove Assault*

To establish a violation of section 245, subdivision (a)(1), the People must prove an assault. An assault is defined in section 240 as "[a]n unlawful attempt, *coupled with a present ability*, to commit a violent injury on the person of another." (§ 240, italics added.) "One may commit an assault without making actual physical contact with the person of the victim; because the statute focuses on *use* of a deadly weapon or instrument

or, alternatively, on force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial. [Citation.]" (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

The "present ability" element "is satisfied when 'a defendant has attained the means and location to strike immediately.' [Citations.] In this context, however, 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion.[] Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*People v. Chance* (2008) 44 Cal.4th 1164, 1168 (*Chance*), fn. omitted.) "[W]hen a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Id*. at p. 1172.)

C. *Discussion*

Defendant argues the People failed to prove the requisite element of "present ability" to assault the victims. Defendant asserts he was too far away from S.W. and M.W. (the victims), and they were inaccessible on the other side of a six-and-a-half-foot high wall. He further contends there was evidence that there was nothing near the wall that would have helped him climb over the wall; he stopped running toward the wall

8

about 15 feet from the wall; an officer estimated the wall was 10 feet high; and there was no evidence he tried to climb over the wall.

However, because there was also substantial evidence supporting a reasonable finding of "present ability," this court must uphold the jury's factual finding of "present ability." This court must examine the whole record in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1053.) In doing so, we conclude there was sufficient evidence to support the jury's finding defendant had a present ability to inflict injury on the victims when he ran toward them holding a hatchet above his head.

Such evidence includes the victims' testimony that, while they stood on chairs peering at defendant on the other side of the wall, defendant ran full speed toward them while raising a hatchet in the air. Defendant had just yelled at them that he was going to "chop" their heads off. The victims testified they believed defendant was capable of climbing over the wall. M.W. testified defendant was a big man and was fast. Although the wall was six and a half feet high, there was evidence defendant had hit the camera post adjacent to the wall with the hatchet, leaving a dent in the post two feet above the top of the wall.

The victims further testified that they feared that defendant would harm them when he charged toward them with a hatchet in the air. In fear, they ducked behind the wall, ran inside their house, locked the door, and called the police. The victims testified

defendant sounded angry, hostile, and very serious about harming them. The reporting police officer testified the victims appeared to be frantic and frightened when he arrived at the scene. Photographs from the security camera were consistent with the victims' account of the incident. In addition, there was evidence defendant had committed other similar incidents in the neighborhood, including assaulting a neighbor with a knife and nearly running over another neighbor.

Based on the foregoing, the jury could have reasonably found that defendant could have hit the victims with the hatchet, had they not fled in fear as defendant charged toward them. The jury could have also found defendant was capable of climbing over the wall. Defendant cites *In re James M.* (1973) 9 Cal.3d 517, for the proposition there was insufficient evidence of the assault element, "present ability," because defendant was 15 feet away from the victims. Defendant's reliance on *James* is misplaced and the instant case is factually distinguishable. In *James*, a minor climbed a chain link fence and threw a rock over the fence at a police officer. The rock missed the officer and hit his patrol car fender, eight feet from the officer. The minor was adjudged a ward of the juvenile court for committing attempted assault with a deadly weapon upon the officer. In *James*, the court did not address the issue of whether the evidence was sufficient to support a finding of present ability to harm the victim. The issue in *James* was whether an attempted assault is a punishable offense. The court held it is not and therefore reversed the minor's adjudication for attempted assault. (*Id*. at p. 519.)

10

Defendant also cites *People v. Valdez* (1985) 175 Cal.App.3d 103 (*Valdez*), which is not on point and distinguishable. In *Valdez*, the defendant was convicted of assault with a firearm. The defendant argued there was insufficient evidence he had the present ability to injure the victim. In *Valdez*, the defendant fired a gun at a gas station clerk. Because the clerk was behind bulletproof glass, unbeknownst to the defendant, the clerk was not injured. The defendant admitted he fired his gun at the clerk because he was angry that the clerk would not wait on him.

The *Valdez* court framed the issue presented as whether "the 'present ability' element of the crime of assault [is] satisfied where some *outside circumstance unknown to the defendant* makes it impossible for the chosen means of attack to actually inflict injury on the victim? Or, more specific to the facts of this case, does a man who fires a loaded gun at another have a 'present ability' to inflict injury where the victim is behind a bulletproof window?" (*Valdez*, *supra*, 175 Cal.App.3d at p. 108, italics added.) The *Valdez* court upheld the assault conviction, concluding there was sufficient evidence the defendant had a present ability to injure his victim. (*Id*. at pp. 106, 114.)

The *Valdez* court explained that the "present ability" element refers to a defendant's objective proximity to infliction of injury, and is not negated by the intended victim's successful attempts to avoid or prevent injury, even when those avoidance attempts render injury impossible. (*Valdez*, *supra*, 175 Cal.App.3d at p. 111.) In *Valdez*, the court defined the term "ability" as "a personal attribute—what a given individual has the capacity to do in contrast with those who lack this quality—not an environmental

11

factor." (*Id*. at p. 111.) "[B]ecause of the 'present ability' element of the offense, to be guilty of assault a defendant must have maneuvered himself into such a location and equipped himself with sufficient means that he appears to be able to strike immediately at his intended victim." (*Id*. at p. 112.) But later, in *Chance*, the court held that "immediately" does not mean "instantaneously." "It simply means that the defendant must have the ability to inflict injury on the present occasion." (*Chance*, *supra*, 44 Cal.4th at p. 1168.)

In the instant case the jury could have reasonably found that defendant equipped himself with the means to inflict serious injury. The evidence showed that, after having just yelled at the victims that he was going to "chop" their heads off, defendant charged toward the victims with a hatchet raised above his head. The victims testified that, even though there was a wall between them and defendant, they feared defendant would harm them. The victims stated they were frightened by his conduct. They said they believed defendant would have been able to strike them. Unlike in *Valdez*, *supra*, 175 Cal.App.3d 103, the wall was not an impenetrable, invisible barrier preventing defendant from harming the victims. The victims testified they believed defendant could have climbed over the wall. Therefore, out of fear, they retreated into their house, locked the door, and called the police.

Defendant argues the victims were not within striking distance because he stopped running toward them about 15 feet from the wall when they fled. But it could be reasonably inferred defendant would have continued running toward the victims had they

remained looking over the wall. It could also be reasonably inferred that defendant could have injured the victims with the hatchet within seconds of charging toward them, had they not retreated into their home. The victims' conduct reflected that they believed, based on defendant's conduct, that they were in imminent danger of being harmed as defendant ran toward them with a hatchet. The evidence as a whole thus supported a reasonable finding that defendant reached a point where he was able to strike the victims.

As the *Valdez* court concluded, "[o]nce a defendant has attained the means and location to strike immediately he has the 'present ability to injure.' The fact an intended victim takes effective steps to avoid injury has never been held to negate this 'present ability.' For example, the intended victim in *People v. Yslas* [(1865) 27 Cal. 630], ran away and hid from the hatchet-wielding attacker who nevertheless was found guilty of assault." (*Valdez*, *supra*, 175 Cal.App.3d at p. 113.) Furthermore, as explained in *Chance*, and reiterated in *People v. Nguyen* (2017) 12 Cal.App.5th 44 (N*guyen*), "immediacy" of harm is not required. (*Chance*, *supra*, 44 Cal.4th at pp. 1168, 1173, fn. 11; *Nguyen*, *supra*, at p. 48.) "To have a 'present ability,' there must be threat of '"a present, and not a future injury."'" [Citation.] However, immediacy is not required. [Citation.] '[W]hen a defendant equips and positions himself to carry out a battery, he has the "present ability" required . . . if he is capable of inflicting injury on the given occasion, *even if some steps remain to be taken*, and even if the victim or the surrounding circumstances thwart the infliction of injury.' [Citations.]" (*Nguyen*, *supra*, at p. 48.)

13

In *Nguyen*, *supra*, 12 Cal.app.5th 44, the court affirmed the defendant's conviction for aggravated assault on two police officers. The conviction was based on evidence the defendant wielded a large knife and took a step toward the police officers after the officers ordered him to put the knife down. (*Id*. at p. 46.) The *Nguyen* court rejected the defendant's contention that, as a matter of law, the People could not prove the "present ability" element because the defendant was 10 to 15 feet from the officers at the time of the incident. (*Id*. at pp. 46, 49.) The *Nguyen* court concluded that whether there was a present ability, where the victim was 10 to 15 feet from the defendant, was a factual matter within the province of the trier of fact. (*Id*. at p. 49.)

Likewise, here, whether defendant had a "present ability" to harm the victims was a triable issue of fact. Even though defendant may have stopped 10 or 15 feet from the victims when they ducked behind the wall in fear of defendant harming them, there was sufficient evidence upon which the trier of fact could have reasonably found that defendant had a "present ability" to harm the victims at the time of the incident. The victims' avoidance of harm, by ducking, jumping down from chairs on the other side of the wall, and running inside their house, did not "alter the fact the defendant had acquired the means and maneuvered into a location to immediately injure his victim." (*Valdez*, *supra*, 175 Cal.App.3d at p. 113; *Chance*, *supra*, 44 Cal.4th at p.1168.) We therefore reject defendant's contention there was insufficient evidence of the "present ability" element of assault with a deadly weapon.

IV.

STAYING SENTENCING UNDER SECTION 654

Defendant contends the trial court erred in not staying his sentence on his convictions for making criminal threats (counts 3 & 4).  We disagree.

The trial court sentenced defendant to concurrent three-year terms for defendant's two convictions for assault with a deadly weapon (counts 1 & 2), with the sentence on count 1 serving as the principal term.  The trial court also sentenced defendant to two-year concurrent terms for each of defendant's convictions for making criminal threats (counts 3 & 4).  The prosecution argued during sentencing that the criminal threat offenses occurred separately from the assault offenses and therefore the criminal threats sentences should not be stayed under section 654.  Defendant argued the criminal threats sentences should be stayed because the assault and criminal threat offenses were one course of conduct.  The trial court rejected defendant's request to stay sentencing on the criminal threats convictions.

Section 654 provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  The statute proscribes punishment for multiple crimes arising from a single act, and also for multiple crimes arising from an indivisible course of conduct.  (*People v. Hicks* (1993) 6 Cal.4th 784, 788-789; *People v. Corpening* (2016) 2 Cal.5th 307, 311-312.)  We determine whether a course of conduct

15

is "divisible" by looking at the defendant's intent and objective, not the temporal proximity of the offenses. (*People v. Hicks*, *supra*, at p. 789; *People v. Latimer* (1993) 5 Cal.4th 1203, 1208, quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 19 ["'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor.'"].)

"'[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once.'" (*People v. Hicks*, *supra*, 6 Cal.4th at p. 789, quoting *People v. Harrison* (1989) 48 Cal.3d 321, 335.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*People v. Harrison*, *supra*, at p. 335.) A course of conduct is divisible in time "'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.'" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717-718.)

We review factual determinations for substantial evidence. (*People v. Valli* (2010) 187 Cal.App.4th 786, 794.) When those facts are undisputed, the application of section

16

654 raises a question of law, which we review de novo. (*People v. Corpening*, *supra*, 2 Cal.5th at p. 312.)

Defendant argues the assault and criminal threats crimes all arose out of a single indivisible occurrence and the crimes were incident to a single objective and intent to scare the victims. Defendant therefore asserts that, under section 654, this court should stay his sentences on the two criminal threats convictions, imposed concurrent to defendant's sentences on counts 1 and 2 for assault with a deadly weapon upon two separate victims. We disagree.

There is substantial evidence that the assault crimes were not committed during a single indivisible occurrence, with a single objective but, instead, involved two separate events and separate objectives, of scaring and harming the victims. Evidence defendant committed the crimes separately includes testimony that, after defendant threatened to chop off the victims' heads, he lowered his hatchet, turned around, and walked back to his house. After having an opportunity to reflect, in a separate course of conduct, defendant all of a sudden turned around and charged toward the victims with the hatchet raised. Multiple punishment was thus proper "where the offenses [were] temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his . . . intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

We therefore conclude substantial evidence supported multiple punishment for defendant's separate acts of threatening the victims, pausing, and then suddenly turning around and committing the second crime of assaulting the victims with a hatchet.

V.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

MENETREZ
J.

18