Filed 4/14/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL RONALD WEBB,<br><br>    Defendant and Appellant. | D080147<br><br>(Super. Ct. No. SCE404310) |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Sheila Lavery O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Steve Oetting, Paige B. Hazard and Julia Park, Deputy Attorneys General, for Plaintiff and Respondent.

For over a hundred and seventy years, California has defined the crime of assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code,[1] § 240.) This case involves the "present ability" requirement. Defendant Daniel Ronald Webb is an amputee with only one leg. He challenges his conviction for assault with a deadly weapon (§ 245, subd. (a)(1)), claiming he lacked the present ability to commit a violent injury when, balanced on his remaining leg and braced against a table in front of him, he lunged at a restaurant worker with a knife. As we explain, we accept that at a certain point, a defendant's own physical limitations or other circumstances might affect how far he or she can move to strike a victim, which in turn may affect whether that defendant had the present ability to commit a battery. But this case lies nowhere near that line. One victim testified that the tip of Webb's blade came within a foot of him and would have struck him had he not backed away. On this record, substantial evidence supports Webb's assault conviction, and we accordingly affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Webb, an unhoused, wheelchair-bound amputee, dined one afternoon on the outdoor patio of a fastfood restaurant in Santee. Shane H., the restaurant's operations manager, and Fabian O., its restaurant leader, were both on site that day. Hearing reports that Webb was yelling and disturbing customers, they called 911. Sheriff's deputies arrived and told Webb to finish his meal and leave.

A short while later, Shane and Fabian came outside to find Webb on the ground. He was laying on his back while still in his wheelchair, as if the

---

[1]      Further statutory references are to the Penal Code.

2

wheelchair had fallen straight backwards.  Finding him unresponsive, the managers called for assistance.  Fire Department personnel tried to wake Webb verbally; when that failed, they kicked him, jolting him awake.  Webb made it back to his wheelchair, and sheriff's deputies told him he could remain there if he ate his food without further disturbance.

Webb returned to his meal but soon grew belligerent.  Shane and Fabian came outside to hear him shouting "fuck you" and other vulgarities at other customers.  When they approached his table to ask if everything was okay, Webb turned on them.

Bouncing up and down in his wheelchair, Webb tried to gain momentum as if to stand.  He was able to stand on his right leg, placing his left hand on the table in front of him to steady himself.  He used his right hand to swing at the managers from a distance of three feet away.  After the first swing, Webb swung again.  This time, Shane and Fabian noticed a knife in his right hand.  It was a foldable buck knife that could be opened and closed, with a four or five inch blade roughly the same size as its handle.  Webb had the blade open and pointed toward them at chest height.

Webb made eye contact with the two managers while lunging and sideswiping at them with his knife, saying, " 'I'm going to fucking kill you,' " and " 'I'm going to stab you.' "  At his closest point, he stood within one to two feet of the pair, with the tip of the blade less than a foot from Shane's body.  The way the three were positioned, the knife would have struck Shane before hitting Fabian.  Shane backed up, believing he would otherwise be stabbed.  Along with six customers who were dining on the patio, he and Fabian retreated inside the restaurant where he dialed 911.

Webb sat back down in his wheelchair.  Fabian returned outside and, standing six feet away, told Webb he had to leave.  Flashing an ominous

3

glare, Webb turned toward him. Webb forcefully wheeled toward Fabian, knife in hand, continuing to swing while wheeling. Turning a corner, he got to within a foot and thrust the knife toward Fabian's midsection, missing by a few inches. Fabian felt he could have been struck had he not jumped back in time.

Deputy Sheriff Antonio Yniguez arrived, spoke with witnesses, and impounded a folding knife found in a planter near the restaurant's front door. The knife blade was closed. Yniguez arrested Webb, who seemed angry and unhappy with the turn of events.

The San Diego County District Attorney charged Webb with two counts of assault with a deadly weapon (§ 245, subd. (a)(1)). Count 1 related to his attempt to stab Shane near the table, while count 2 pertained to his subsequent attempt to stab Fabian.[2] The amended information further alleged that Webb had a prior serious felony conviction for assault with a deadly weapon (§§ 245, subd. (a)(1), 1192.7, subd. (c)(23)), resulting in a five year enhancement (§ 667, subd. (a)(1)) and a doubled sentence under the Three Strikes Law (§§ 667, subds. (b)–(i)). Finally, Webb was ineligible for probation on account of two prior serious felony convictions. (§ 1203, subd. (e)(4).)

Webb waived his right to a jury, opting for a court trial instead. Shane, Fabian, and Deputy Yniguez testified about the incidents and their aftermath. Webb took the stand in his defense but had no memory of the

---

[2]    The charging document alleged as to both counts that Webb personally used a deadly and dangerous weapon within the meaning of sections 1192.7, subdivision (c)(23) and 12022, subdivision (b)(1). These allegations had no sentencing consequences. (See § 12022, subd. (b)(1) [adding a one-year consecutive term "unless use of a deadly or dangerous weapon is an element of that offense"].)

incident. He surmised that he was having a seizure if he bounced up and down as described. He conceded that he appeared to be maneuvering his wheelchair afterwards in surveillance footage, which he could not do during a seizure.

In her closing argument, the prosecutor maintained that despite Webb's limitations and disabilities, he was able to swing a knife at Shane and Fabian on two separate occasions. The fact that the victims were able to avoid injury by backing away did not negate his present ability to commit a violent injury.

Given that the knife was recovered in a closed position, and Webb's physical limitations, defense counsel argued that the circumstances were inconsistent with Webb having an "actual ability to move forward and actually assault these individuals." Webb spontaneously interjected that he "had a full-blown epileptic seizure." Judge Thompson explained that it was his mental state at the time of the incidents that mattered. Finding him guilty of both assault counts, the judge explained:

> "I am not buying into the argument that you could not have delivered a blow had they not gotten out of the way. There's no question in my mind that you had the knife, the knife was open, you're swearing at them, you're telling them, 'I'm going to kill you,' and then you lunge at them with a knife. That is an [assault with deadly weapon]. There's nothing I can do to get around that for you.
>
> "So there's overwhelming evidence that you're guilty of those two crimes. I'm going to find you guilty of those two crimes."

Accepting the prosecutor's exhibits, the trial court found that Webb's prior convictions had been proven. Moving on to sentencing, it struck the five-year prior serious felony enhancement and strike. (§ 1385.) It imposed a

5

three-year middle term on both counts (§ 245, subd. (a)(1)) and ran the two terms concurrently. Finally, the court imposed a $300 restitution fine (§ 1202.4) and mandatory fees and costs.

## DISCUSSION

Webb challenges his conviction on count 1. He contends that because of his physical limitations—an amputee balancing on one leg swinging at Shane across a table—he lacked the present ability to inflict violent injury, a core element of assault. Although he raises an interesting question of how a defendant's physical limitations might impact his ability to get within striking distance, the record amply supports his conviction where Shane testified that the knife came within a foot of him and he had to back up to avoid being struck.

A. *The "present ability" element of assault asks if the defendant acquired the means and location to commit a violent injury.*

The crime of assault with a deadly weapon under section 245, subdivision (a)(1) requires proof of an assault. In far from simple English, California law has since 1850 defined assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) This "present ability" requirement distinguishes California assault law from its common law counterpart. (*People v. Wolcott* (1983) 34 Cal.3d 92, 99.) In California, "to constitute an assault, the defendant must not only intend to commit a battery [citation]; he must also have the present ability to do so." (*Ibid.*; see *People v. Valdez* (1985) 175 Cal.App.3d 103, 110 (*Valdez*) [California law requires an objective present ability to injure].) Perhaps the most common example illustrating this distinction involves unloaded firearms or toy guns. There can be no present ability to commit an assault with an *unloaded* gun (unless it is used as a club

6

or bludgeon). (*People v. Mosqueda* (1970) 5 Cal.App.3d 540, 544; *People v. Sylva* (1904) 143 Cal 62, 64; *People v. Lee Kong* (1892) 95 Cal. 666, 669 (*Lee Kong*).)

The California Supreme Court defined the present ability requirement in *People v. Chance* (2008) 44 Cal.4th 1164 (*Chance*). In that case, defendant Kenneth Wayne Chance fled from sheriff's deputies and disappeared behind a 21-foot trailer. Lying in wait, Chance hid behind the trailer holding a firearm in front of him with the safety off. Unbeknownst to him, a deputy rounded the trailer from the other side, meaning Chance's gun was pointed the wrong way. Chance was apprehended, and fifteen rounds were found in the gun, although no bullet had been transferred into the firing chamber. (*Id.* at pp. 1168–1169.) The question before the Supreme Court was whether these facts would support a conviction for assault even if the next step— Chance pulling the trigger—would not have resulted in a battery. Holding they would, the court explained: "[W]hen a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Chance*, at p. 1172.) Reasoning that Chance was sufficiently far along the "continuum of conduct toward the battery," the court noted that he had the means and location to injure the deputy notwithstanding the deputy taking a different route than Chance anticipated. (*Id.* at pp. 1173, 1175–1176, italics omitted.)

In reaching this conclusion, the *Chance* court drew from several older cases. Some considered whether the defendant had *equipped himself* to carry out a battery; others looked to whether the defendant had *positioned himself* to do so. Still other cases evaluated whether external circumstances

7

unknown to the defendant could negate his present ability. We discuss each of these categories in turn before turning to the unique facts before us.

*Chance* first considered several cases analyzing whether the defendant was sufficiently *equipped* to commit a battery despite the positioning of his weapon. The defendant in *People v. McMakin* (1857) 8 Cal.547 drew his revolver and threatened to shoot a man on horseback. This amounted to present ability even though the gun was pointed downward at an angle away from the rider. *People v. Thompson* (1949) 93 Cal.App.2d 780 was similar, finding present ability even though the defendant pointed his firearm downward. (*Id.* at p. 782.) Other cases presented variations on this theme, upholding assault convictions where the gun was not *immediately* ready to fire. (*People v. Simpson* (1933) 134 Cal.App. 646, 650 (*Simpson*) [no bullet in the firing chamber]; *People v. Ranson* (1974) 40 Cal.App.3d 317, 321 [jammed gun that could be cleared to shoot]; *People v. Hunter* (1925) 71 Cal.App. 315, 317−319 (*Hunter*) [gun got stuck in defendant's sock as he tried to unfasten a garter holding the sock].)

The cases above largely considered whether a defendant was armed and ready to inflict injury, even if it would take several additional steps. *Chance* and other cases focused more on the defendant's spatial positioning. The fact that the officer approached Chance from behind did not negate that Chance was both equipped *and positioned* to commit a violent injury. (*Chance, supra,* 44 Cal.4th at pp. 1175−1176.) The same result was reached in *Lee Kong, supra,* 95 Cal. 666, where the defendant aimed his gun at a hole in the ceiling and fired, intending to kill a police officer. The fact that the officer was standing elsewhere at the time did not negate his present ability; the officer "was sufficiently near to be killed from a bullet from the pistol." (*Id.* at p. 670.)

8

While *Chance* and *Lee Kong* involved the defendant's mistaken assumption about his victim's whereabouts, more recent cases have looked to a defendant's spatial proximity to the victim to determine if he or she is "positioned . . . within striking distance" for purposes of present ability. (*Chance, supra,* 44 Cal.4th at p. 1174.) Courts (including ours) have found a present ability where a defendant is positioned 10 to 15 feet away from the victim while wielding a knife. (*People v. Nguyen* (2017) 12 Cal.App.5th 44, 49 (*Nguyen*); *In re Raymundo M.* (2020) 52 Cal.App.5th 78, 87−88 (*Raymundo M.*); see also *People v. Yslas* (1865) 27 Cal. 630, 631 (*Yslas*) [defendant wielded a hatchet from seven or eight feet away].) These cases rely on *Chance*'s guidance that an assault may occur even a few more steps remain before the defendant can inflict injury. (*Chance,* at p. 1172.) But at some point a defendant's distance to his victim will be too great to permit a finding of present ability. "[I]t does not necessarily follow that a perpetrator who is in a position to shoot 'at' another person *can* strike his target if, for example, the target is too far away." (*People v. Licas* (2007) 41 Cal.4th 362, 370.) A defendant's choice of weapon or other case specific circumstances might well impact how far the strike zone objectively extends.

To sum up the analysis to this point, *Chance* held that a defendant has a present ability to commit a violent injury where he or she attains the means and location to do so, *even if additional steps remain to be taken*. (*Chance, supra,* 44 Cal.4th at p. 1172.) Courts typically apply that rule to a defendant who is several steps away from committing a battery. But *Chance* further clarified that surrounding circumstances or steps taken by the victim to avoid injury do not negate a defendant's present ability. (*Ibid.*) For example, in *Yslas, supra,* 27 Cal. at page 631, the defendant was presently able to inflict injury when he raised a hatchet seven or eight feet away from

9

the victim intending to strike her, even though she escaped by running into another room and locking the door. (See also *People v. Raviart* (2001) 93 Cal.App.4th 258, 267 [peace officer dove for cover as the defendant pointed a gun at him]; *Hunter, supra,* 71 Cal.App. at p. 319 [wife jumped out the window before her husband could aim gun at her].) As a variation on this theme, external circumstances like bulletproof glass might make injury impossible but do not negate present ability where the defendant acquires the means and position to inflict injury and launches the attack. (*Valdez, supra,* 175 Cal.App.3d at p. 112; accord *Chance, supra,* 44 Cal.4th at p. 1174.)

With this overview of the "present ability" element of assault, we turn to our facts.

B.    *Sufficient evidence supports the court's finding that Webb had the present ability to inflict violent injury on Shane.*

Webb was charged in count 1 for assaulting Shane with his knife in the first of two charged incidents occurring that day. Shane and Fabian came outside to check on Webb following reports that he was acting belligerently toward other customers. He swung at them with a buck knife in his right hand while balancing on his right leg and steadying his left hand against the table in front of him. Webb was indisputably an amputee and wheelchair bound. The question is whether the facts surrounding the first incident could support a finding beyond a reasonable doubt that Webb had the present ability to inflict violent injury on Shane.

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People*

10

*v. Vargas* (2020) 9 Cal.5th 793, 820.) The same standard applies following a court trial. (See *People v. Lyu* (2012) 203 Cal.App.4th 1293, 1298–1299.) Reversal is warranted only if there is no substantial evidence to support the verdict under any possible hypothesis. (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

This case is distinct from those discussed by *Chance* or its progeny. Webb was *equipped* to commit a violent felony when he held a knife a few feet away from Shane with the blade open.[3] Unlike the defendants in *Chance* and *Lee Kong*, Webb knew exactly where Shane stood, and no external barriers—invisible or otherwise—intervened as in *Valdez*. Locationally speaking, Webb's proximity to Shane and Fabian during this incident was closer than the striking distance deemed sufficient in *Yslas*, *Nguyen*, and *Raymundo M.*

But unlike those defendants, Webb was a wheelchair-bound amputee who could not stand without assistance. He asserts this fact is critical. As he suggests on reply:

> "What respondent ignores and none of the cases speak to is Webb's actual physical inability to commit assault in the situation he was in. Based on the victim's own testimony, not only was a table between them making it impossible for Webb to reach them, but Webb was precariously balanced on one leg with only the table holding him up. Webb testified he [could not] stand up without assistance and also cannot walk without an aid. Thus, he never had the

---

[3] He does not renew his argument on appeal that the blade was closed. Both Shane and Fabian testified to seeing it open, supporting the trial court's factual finding. Moreover, several of the cases cited above support the proposition that a defendant is equipped with the means to inflict violent injury even if he must push open the blade of a folding knife. (See, e.g., *Simpson, supra,* 134 Cal.App. at p. 650.)

11

ability to get any closer to Hernandez to commit an assault."

As we explain, we accept his premise as a matter of theory but still disagree with his conclusion.

In the abstract, we have no difficulty agreeing that a defendant's physical limitations may affect the distance he objectively can traverse—and in turn whether he came within striking distance of the victim for purposes of finding a present ability. This might be a different case if Webb did not have his wheelchair right behind him or if Shane and Fabian were positioned some significant distance away (there being no indication Webb intended to throw his knife). The positioning of the table might also affect his radius of mobility while balancing on one leg. But on *our record*, this case is not close and we need not decide exactly where the line must be drawn.

According to Shane, Webb stabilized himself at the table in front of him and lunged at the two managers with his knife as they stood less than three feet away. His swinging motion was "[a]lmost like a side swipe . . . coming from the side and going forward." As he lunged, Webb made eye contact and said he was going to stab and kill them. He got to within a foot of Shane as he lunged a second time. Shane and Fabian "stepped back for safety reasons." Asked point blank, Shane testified: "if I didn't move I would have been stabbed."[4]

_____

[4] Shane also testified that had Webb continued to lunge, his body would have been stopped by the table in front of him. In this exchange, Shane suggested Webb would have had to take one "little step" to the left to reach him with his knife. This evidence arguably conflicts with Shane's testimony that he would have been stabbed had he not moved away, which the trial court believed. But even if this additional testimony were credited, Webb testified that he could stand if he had something to hold onto. This supports a reasonable inference that Webb could have hopped one step while holding

Fabian offered a similar account—he and Shane approached within two or three feet of Webb, hoping to diffuse the situation, when Webb turned and threatened to kill them.  Webb then lunged at them, holding his knife sideways at chest height.  As he lunged, he came within a foot or two away.  The way Shane and Fabian were positioned, Webb would have struck Shane first and been stopped or grazed Shane before striking Fabian.  Fabian believed that Webb could stab or slash them as he lunged.

We need not engage in difficult line drawing to determine the precise limits of a defendant's striking radius in light of particular physical limitations.  Wherever that line lies as to Webb, his actions clearly fell within it, given evidence he thrust his blade within a foot of Shane, causing him to step back to avoid being stabbed.  Considering the record in the light most favorable to the judgment, there is ample substantial evidence to support the court's finding that Webb committed an assault.  Despite his physical limitations, Webb had the present ability to inflict violent injury when he lunged at Shane at close distance while holding a knife at chest height.

---

onto the table.  That scenario would be virtually indistinguishable from those finding a defendant within striking distance despite being several feet away from the intended target.  (See, e.g., *Nguyen, supra,* 12 Cal.App.5th at p. 49.)

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:


IRION, Acting P. J.


BUCHANAN, J.