Filed 1/27/25  P. v. Cornejo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>OTONIEL CORNEJO,<br><br>Defendant and Appellant. | C098631<br><br>(Super. Ct. No. STK-CR-FE-2019-0003551) |

Defendant Otoniel Cornejo was convicted of several counts of assault with a firearm on a peace officer and one count of unlawful possession of a firearm.  Under California law, assault requires a present ability to commit a violent injury.  (Pen. Code, § 240.)[1]  On appeal, Cornejo contends that the record lacks substantial evidence that he had the present ability to commit a violent injury because, he asserts, the evidence was insufficient to prove that the single bullet in his gun was capable of firing.  He challenges

---

[1]  Undesignated statutory references are to the Penal Code.

1

the trial court's denial of his motion for a new trial on similar grounds. He further contends that he is entitled to additional presentence custody credit and to conduct credit.

We reject Cornejo's challenge to his assault convictions because there was sufficient evidence to support the jury's verdict. Regarding Cornejo's sentence, we see no basis in the present record to order additional presentence custody credits; but we agree with Cornejo that he is entitled to presentence conduct credits. We therefore modify the judgment to reflect the appropriate award of conduct credits but otherwise affirm the judgment.

BACKGROUND

On January 17, 2019, law enforcement officers surrounded a house where Cornejo was staying to execute a warrant for his arrest. As officers stood outside the house's open front door negotiating with Cornejo inside, Cornejo suddenly came around a corner, said "[f]uck it" or "fuck this," squared himself toward the officers in the doorway, and pointed a raised revolver in their direction. Officers "saw a flinching motion, like [Cornejo] was pulling the trigger." A few of the officers heard two clicks from Cornejo's gun, which are audible on the body camera video shown to the jury, consistent with the sound of "the trigger being pulled and a hammer falling on the action." Cornejo's gun, however, did not fire. The officers then shot Cornejo multiple times and eventually arrested him inside the house.

Cornejo was taken to a local county hospital to receive treatment for his injuries. He remained hospitalized for nearly eight weeks before being transported and booked into jail.

In October 2020, the People charged Cornejo with two counts of attempted premeditated murder of a peace officer (§§ 664, 187, subd. (a); counts one and two), five counts of assault with a firearm on a peace officer (§ 245, subd. (d)(1); counts three through seven), and one count of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count eight). As to counts one through seven, the People alleged that

2

Cornejo personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)) and as to count eight, that Cornejo used a firearm (§ 1170.12, subd. (c)(2)(C)(iii)). It was further alleged that Cornejo had suffered two prior strike convictions (§§ 667, subd. (d), 1170.12, subd. (b)) and two prior serious felony convictions (§ 667, subd. (a)).

At trial, the prosecution presented the testimony of (among others) a robbery and homicide detective, an evidence technician, and a criminologist. The detective and the technician testified that the only ammunition, spent or intact, found at the scene that matched the caliber of Cornejo's revolver was an unfired bullet, or cartridge, still in one of the five chambers of the revolver's cylinder.[2] The "fully intact cartridge" had not discharged its bullet, but the firing pin had struck the primer, leaving a "heavy" impression.

The detective testified that the presence of the impression meant "the trigger was pulled and the hammer struck the bullet, but the bullet did not fire." When defense counsel asked the detective whether she could "tell if it ever could have been fired," she testified: "The bullet's still intact here. So based on my training and experience, I would say it's still technically live even though it didn't fire." Defense counsel then asked: "But you don't know whether or not if you repeatedly hit it with the hammer that it would actually go off, correct?" The detective responded, "[t]here's a chance it still could. It's still technically live until the gun powder[ i]s removed from it and the bullet[ i]s removed from the shell casing." She confirmed that she could not say with certainty that it would fire "[u]nless [she] physically did it."

---

[2] The witnesses at trial varied in using the term "bullet" or "cartridge" when referring to an individual round of ammunition, which they explained consists of several components, including the primer, casing, and a projectile (or bullet) at the tip. The witnesses uniformly used only the term "bullet" to refer to the projectile component at the tip of the round that is expelled when a gun fires. Because the parties primarily use the term "bullet" to refer to a round of ammunition in the broader sense, we do the same. Where quoting or describing the testimony of a witness, we use the term the witness used.

The evidence technician showed the bullet to the jury and described it as "the live bullet round" from the revolver. The technician also described what looked like an indentation from a hammer strike on the primer, though he could not say how many times the hammer may have struck.

The criminologist testified that, because of the distinct firing pin impression, which appeared strong enough to fire the cartridge, this "was a misfire of some type." Her "educated guess" on why the gun misfired was that "there was something wrong with the ammunition." She stated that "the hammer definitely hit the firing pin," possibly multiple times, so she did not believe the problem was "the function of the firearm. It was, again, more likely the cartridge had an issue." She testified that during function testing and test-firing with her own ammunition the gun fired normally. On cross-examination, the criminologist agreed that there could be many reasons why a cartridge might misfire and that someone could try to fire the same cartridge "ten times and it might never fire."

Cornejo also testified. He said that he tried to commit suicide with the gun multiple times inside the house before confronting the officers, but the gun would not fire. He then tried to kill himself using a knife but was again unsuccessful. Cornejo finally decided to try to prompt the officers to kill him by advancing on them with the gun and repeatedly pulling the trigger to make it seem like a realistic attack.

The jury found Cornejo guilty of all five counts of assault with a firearm on a peace officer and the single count of being a felon in possession of a firearm. It also found true the firearm enhancements for each of those counts. The jury hung on the two counts of attempted premeditated murder. The trial court declared a mistrial on those counts and later dismissed them at the prosecution's request.

After trial, the People filed a second amended information to allege only one prior serious felony conviction (§ 667, subd. (a)) and to correct the dates of the two alleged

4

prior strikes. In a bifurcated bench trial, the trial court found true each of these allegations.

Cornejo moved for a new trial based on, among other claims, a lack of evidence that the bullet in his revolver could fire. In considering Cornejo's argument that evidence of the bullet's misfiring showed that it was not capable of firing, the trial court said that such evidence did "not prove that [the bullet] was not a live round." The court stated: "[T]he issue is was it a live round. [¶] . . . [¶] I don't think there was testimony that anyone checked to see if there was gunpowder in it, or a primer." The court told defense counsel, "if you would have asked to have someone open that round up and see if there was a primer and see if there was gunpowder, I wouldn't have hesitated to order it."

After hearing further argument from defense counsel and the prosecution, the trial court denied Cornejo's motion, explaining: "The next issue . . . is was the bullet still live. Was it a live bullet? I don't think there is a reasonable doubt about it. I think beyond a reasonable doubt it was a bullet capable of firing, that the gun was operative, and the bullet appeared to be capable of firing. Just because you have a misfire on a bullet doesn't mean that bullet isn't going to fire. As I say, would you point that bullet at a child after it has misfired two times or ten times and pull the trigger? Absolutely not. [¶] So at the time of the trial, the state of the evidence was that that was a bullet that was a live round and capable of firing."

The trial court sentenced Cornejo to a total term of 25 years to life in state prison, with 1,533 days of presentence custody credits and no conduct credits. The court stated that it would order the Department of Corrections to impose "any additional credits to which [Cornejo] is entitled."

Cornejo filed a timely appeal.

5

## DISCUSSION

### I.

Cornejo seeks reversal of his assault convictions under section 245, subdivision (d)(1) on the ground that there was insufficient evidence that he had the "present ability" to commit a violent injury.

### A.

Section 245, subdivision (d)(1) provides that "[a]ny person who commits an assault with a firearm upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for four, six, or eight years."  "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  (§ 240.)  "In California, 'to constitute an assault, the defendant must not only intend to commit a battery [citation]; he [or she] must also have the present ability to do so.' "  (*People v. Webb* (2023) 90 Cal.App.5th 660, 665-666, quoting *People v. Wolcott* (1983) 34 Cal.3d 92, 99.)  The present ability element of assault "is satisfied when 'a defendant has attained the means and location to strike immediately,' " meaning "on the given occasion."  (*People v. Chance* (2008) 44 Cal.4th 1164, 1168, 1172; see also *People v. Valdez* (1985) 175 Cal.App.3d 103, 112 ["to be guilty of assault a defendant must have maneuvered himself into such a location and equipped himself with sufficient means that he appears to be able to strike immediately at his intended victim"].)

"When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court. We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt."  (*People v. Vargas* (2020) 9 Cal.5th 793, 820 (*Vargas*).)  We

6

" 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) "Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052; see *People v. Ghobrial* (2018) 5 Cal.5th 250, 281 [" 'unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction' "].)  " 'A reviewing court neither reweighs [the] evidence nor reevaluates a witness's credibility.' [Citation.]  Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]" ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 378.)

B.

We conclude that the assault convictions in this case were supported by sufficient evidence that Cornejo had the present ability to commit a violent injury.  Cornejo does not dispute that he was spatially positioned to injure the officers by shooting them, that his gun was operable, or that it was loaded with one bullet.  Cornejo's sole contention is that the People failed to prove that he equipped himself with the means to injure because, he maintains, there was insufficient evidence to prove that the bullet in his revolver was a live round.  He argues that, without evidence that the round was live, his revolver was, in effect, "unloaded or inoperable" and he therefore lacked the present ability to harm.  (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 11, fn. 3 ["A long line of California decisions holds that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person"]; *People v. Wolcott*, *supra*, 34 Cal.3d at p. 102 ["use of an unloaded or inoperable gun" does not support assault conviction]; *People v. Lee Kong* (1892) 95 Cal. 666, 669 [same for "unloaded gun"]; *People v. Webb*, *supra*, 90 Cal.App.5th at p. 666 [no assault with unloaded gun unless used as club or bludgeon].)

7

Viewing the evidence in the light most favorable to the judgment, we reject Cornejo's contentions because there was substantial evidence that his revolver was operable and loaded with a live round. The jury in this case heard testimony that the bullet in Cornejo's gun was "live" no fewer than six times, from two witnesses. The jury heard from the case detective that the bullet was "still intact" and so, "based on [her] training and experience, [she] would say it's still technically live even though it didn't fire." In response to defense counsel's next question, the detective further explained that the bullet was "still technically live" until the gun powder is removed and the bullet is removed from the casing.

The jury heard similar descriptions of the bullet from the evidence technician who collected the revolver from the scene. He showed the jury the physical bullet, and it was admitted into evidence. When he was first asked what he was removing from the evidence packaging, the technician stated that it was an envelope "containing the live bullet round from the revolver." When he took the bullet out of the envelope, he told the jury, "[t]hat is the live bullet round." On cross-examination, the technician said that he would call the item "probably [a] bullet or live bullet round" and then confirmed that he had, indeed, testified that "this is a live round." Viewed most favorably to the judgment (*Vargas*, *supra*, 9 Cal.5th at p. 820), these statements were sufficient for a reasonable jury to find that the bullet in Cornejo's revolver was, in fact, live.

Cornejo argues that these statements were just unexplained labels, not evidence of the requisite "solid value" to sustain the verdict. (*Vargas*, *supra*, 9 Cal.5th at p. 820.) But the repeated assertions of the bullet's liveness came from law enforcement professionals with a combined 16 years of experience, who personally observed or handled the bullet. Jurors could rationally accept those statements at face value. There was nothing " 'physically impossible or inherently improbable' " about this testimony such that the jury could not properly rely on it. (*People v. Ghobrial*, *supra*, 5 Cal.5th at

8

p. 281; see *People v. Young* (2005) 34 Cal.4th 1149, 1181 [finding no "inherent improbability" in either of two witnesses' testimony].)

Cornejo points to other evidence in the record, which he argues shows that the People proved only a mere "possibility" that the bullet would fire. The testimony on which Cornejo relies, however, does not establish that the People failed to prove beyond a reasonable doubt that the bullet in Cornejo's revolver was capable of firing.

Cornejo first emphasizes that the sole bullet in his gun did not fire when it was struck with the hammer. As Cornejo appears to concede, the jury could reasonably infer from the evidence that the bullet was struck only once, resulting in a single misfire. The criminologist testified that, by virtue of the revolving cylinder, multiple hammer strikes would not have successively struck the same chamber. And the jury was not required to credit Cornejo's testimony that his gun failed to fire multiple times during his earlier suicide attempts. (*People v. Fuiava* (2012) 53 Cal.4th 622, 715, fn. 34 [jury may reject testimony even if not directly contradicted].) Based on the evidence at trial, the jury could rationally find, beyond a reasonable doubt, that Cornejo's gun misfired only once and that he had the present ability to commit a violent injury, where a live bullet remained ready and waiting to be struck again when it came back around to firing position. (See *People v. Ranson* (1974) 40 Cal.App.3d 317, 321 [upholding assault conviction and noting that "[t]ime is a continuum of which 'present' is a part. 'Present' can denote 'immediate' or a point near 'immediate' "].)

Cornejo also notes that the criminologist testified that someone could "try to fire it ten times and it might never fire." He interprets this testimony to refer to the specific bullet inside his revolver. But that is not the necessary or only reasonable reading of this testimony. The criminologist's testimony followed a colloquy about the many reasons why "a" cartridge might misfire. Defense counsel then asked: "So somebody could click on the same cartridge—or try to fire it ten times and it might never fire, correct?" When the criminologist concurred, the jury could have understood her to be confirming that, as

9

a general proposition, a defective cartridge might never fire despite repeated hammer strikes. The criminologist did not offer a definitive opinion on whether the particular bullet in Cornejo's revolver was defective. She offered only an "educated guess" that "there was something wrong with the ammunition." While the jury could reasonably credit that well-informed guess to conclude that this particular bullet was defective and therefore might never fire no matter how many times the hammer struck it, the jury could also reasonably discount that testimony as just a "guess" and rely instead on the testimony of other law enforcement witnesses who stated that Cornejo's bullet was, in fact, a "live" round. On substantial evidence review, it is not our role to reweigh this evidence. (*People v. Thomas*, *supra*, 14 Cal.5th at p. 378.)

Finally, Cornejo highlights the detective's testimony that there was "a chance [the bullet] still could" fire. But the detective's statement was not the sum total of the prosecution's evidence. To the contrary, the jury heard repeatedly that the bullet in Cornejo's revolver was "live." That was evidence of solid, credible value that Cornejo's gun was capable of firing. (*Vargas*, *supra*, 9 Cal.5th at p. 820.)

In his closing argument, defense counsel focused the jury on the question of the bullet's functionality, saying, "if that bullet could not fire and a reasonable person could not believe that that bullet could fire," then Cornejo could not have had the present ability to injure anyone with it. Counsel urged the jury to listen to the prosecutor's rebuttal argument to "see if she even gives you some kind of an explanation for how that bullet could even be live even if it [wa]s in that gun . . . ." The jury rejected the defense's view of the evidence when it found beyond a reasonable doubt that Cornejo had the present ability to inflict injury. While a reasonable factfinder could have seen the trial evidence differently, that is not a sufficient basis for us to overturn the jury's verdict. (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 12 [critiquing Court of Appeal's reasoning that "amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected"]; *Vargas*, *supra*, 9 Cal.5th at p. 820 ["[i]f the finder of

fact's determination is supported, whether the prosecutor relied upon direct or circumstantial evidence, . . . reversal is not warranted, even where ' "the circumstances might also reasonably be reconciled with a contrary finding" ' "].)

II.

We reject as well Cornejo's related challenge to the trial court's denial of his motion for a new trial.

" 'A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion. " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' " ' " (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 730.)

Cornejo contends that the trial court abused its discretion by misapplying the beyond a reasonable doubt standard in assessing his insufficiency of the evidence claim. He emphasizes both the court's statement that he could have asked for the bullet to be analyzed, which he interprets as placing the burden on the defense to disprove the gun's functionality, and its line of reasoning that no reasonable person would have pointed this gun at a child and pulled the trigger after it misfired.

We discern no abuse of discretion. When looking at the transcript as a whole, it is clear that the trial court applied the reasonable doubt standard. The court expressly determined that the evidence showed "beyond a reasonable doubt [that] it was a bullet capable of firing" and "that the gun was operative." The court acknowledged that the evidence could have supported an inference that the bullet was not capable of firing; but, consistent with our conclusion above, the court ultimately found that the evidence supported the opposite conclusion beyond a reasonable doubt. The trial court did not misapply the governing standards in denying Cornejo's motion for a new trial.

11

Cornejo separately requests that we modify the judgment to award him additional presence credits, beyond the 1,533 days awarded by the trial court. Cornejo argues that he is entitled to an additional 54 days of actual custody credit and to a total of 229 days of conduct credit. The People oppose awarding any additional custody credit but agree that Cornejo should receive 229 days of conduct credit.

## A.

"Everyone sentenced to prison for criminal conduct is entitled to credit against his [or her] term for all actual days of confinement solely attributable to the same conduct." (*People v. Buckhalter* (2001) 26 Cal.4th 20, 30, citing §§ 2900, subd. (c), 2900.1, 2900.5, subds. (a) & (b).) Specifically, "when the defendant has been in custody, including, but not limited to, any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or similar residential institution, all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment . . . ." (§ 2900.5, subd. (a).) "Whether a particular facility will be regarded as sufficiently restrictive as to amount to custody" for purposes of section 2900.5 is often a factual question, turning on such things as the degree of supervision, level of structured programming, and the extent to which the defendant's freedom of movement is restricted. (*People v. Reinertson* (1986) 178 Cal.App.3d 320, 326.)

In this case, the trial court awarded Cornejo 1,533 days of presence custody credit, corresponding to the period between his March 12, 2019 booking into jail and his May 22, 2023 sentencing. Cornejo contends that he should also have received custody credit for the 54 days he spent being treated in the hospital for the injuries he sustained in the standoff with police, before being transported and booked into jail. Although Cornejo did not object to his presence credits award at sentencing, "[a] sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever

discovered."  (*People v. Taylor* (2004) 119 Cal.App.4th 628, 647; see *People v. Scott* (1994) 9 Cal.4th 331, 354.)

Cornejo acknowledges that the record before us does not disclose any details of the conditions of his hospitalization following his arrest.  Nonetheless, he argues that, given the seriousness of the offenses for which he was charged, "the only reasonable inference is that [he] was not free to leave the hospital."  This assertion does not provide a sufficient basis to treat his hospital stay as time "in custody" within the meaning of section 2900.5.  "[C]ustody credits are to be given for time spent within a residential detention facility, not for merely being in the custody of police."  (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 920; see *id.* at pp. 920-921 [explaining that *Miranda v. Arizona* (1966) 384 U.S. 436 custodial interrogations standard of not being "free to leave" does not apply to custody credit determinations].)  Thus, even assuming that Cornejo had been arrested (dis. opn., *post*, at pp. 3-4) and was not free to leave the hospital, more facts are required to determine whether the conditions of his hospital stay were "sufficiently restrictive as to amount to custody" for which credit is authorized under section 2900.5.  (*People v. Reinertson*, *supra*, 178 Cal.App.3d at p. 326; see *People v. Ravaux*, *supra*, at pp. 919-920 ["custody" for § 2900.5 does not begin upon arrest]; *People v. Pottorff* (1996) 47 Cal.App.4th 1709, 1718 ["credit is available under section 2900.5 only where the imposed restrictions render the placement akin to confinement in a facility or institution"].)  We cannot tell, for example, whether the police released Cornejo to the hospital for treatment or what degree of supervision, restraint, or daily structure he experienced while there.

On the present record, we therefore decline to modify the judgment to award custody credits for the period of Cornejo's hospitalization.  Once the judgment is final, he is free to seek relief through a petition for habeas corpus on a more developed factual record.  (See *In re Joyner* (1989) 48 Cal.3d 487 [considering habeas petition claiming entitlement to presentence credit]; *People v. King* (2022) 77 Cal.App.5th 629, 640 ["A

13

defendant who is serving a longer sentence than the law allows may challenge the sentence in a petition for a writ of habeas corpus"].)

B.

Cornejo also asks that we modify the judgment to award 229 days of presentence conduct credit. The People concede, and we agree, that he is entitled to this credit.

Generally, a defendant may accrue two days of what is known as conduct credit for every two days confined in jail before sentencing. (§ 4019, subds. (b), (c), (f); see *People v. Arevalo* (2018) 20 Cal.App.5th 821, 827 ["A defendant may 'accrue both actual presentence custody credits under . . . section 2900.5 and conduct credits under . . . section 4019 for the period of incarceration prior to sentencing' "].) Section 4019 applies to confinements in a more limited set of facilities than does section 2900.5 (see § 4019, subd. (a)), and Cornejo acknowledges that he is not entitled to conduct credit for the time he spent in the hospital. Cornejo also correctly recognizes that section 2933.1, subdivision (c) limits him to receiving as conduct credit a maximum of 15 percent of his actual custody credits because the jury's true findings on the firearm enhancements (§§ 12022.5, subd. (a), 12022.53, subd. (b)) rendered his assault convictions violent felonies. (§§ 667.5, subd. (c)(8), (22), 2933.1, subd. (c).)

At sentencing, the trial court awarded "pre-sentence credit" of 1,533 days and "[n]o additional pre-sentence credit," noting that it would order the Department of Corrections to award "any additional credits to which [Cornejo] is entitled." As the People concede, in so doing, the court failed to determine and award presentence conduct credits under section 4019. (See *People v. Brown* (2012) 54 Cal.4th 314, 321 [Department of Corrections "does not determine and award presentence credits; the sentencing court does"].) Performing the appropriate calculations in this case, 15 percent of 1,533 days is 229.95 days, entitling Cornejo to 229 days, as "the greatest whole number of days which does not 'exceed 15[.00] percent of the actual period of confinement. . . .' " (*People v. Ramos* (1996) 50 Cal.App.4th 810, 816, quoting § 2933.1,

14

subd. (c).)  The judgment shall therefore be modified to reflect 229 days of presentence conduct credit under section 4019.

## DISPOSITION

The judgment is modified to reflect that Cornejo is awarded 1,533 days of actual custody credit and 229 days of conduct credit, for a total of 1,762 days of presentence credit.  The trial court is ordered to prepare an amended abstract of judgment reflecting this modification and further ordered to forward a certified copy of the amended abstract of judgment to the Department of Corrections.  In all other respects, the judgment is affirmed.


      /s/ 
FEINBERG, J.


I concur:


  /s/ 
KRAUSE, J.

15

ROBIE, Acting P. J., Dissenting.

I respectfully dissent because the majority does not identify any substantial evidence defendant Otoniel Cornejo had the present ability to commit a violent injury to uphold his convictions for assault with a firearm. Unless it could be used as a bludgeon, a firearm incapable of firing a bullet does not have a present ability to commit violent injury. (*People v. Webb* (2023) 90 Cal.App.5th 660, 666 [no present ability with an "unloaded firearm[] or toy gun[] . . . (unless it is used as a club or bludgeon)"].) Our Supreme Court confirmed this is the law in California over 130 years ago. (*People v. Lee Kong* (1892) 95 Cal. 666, 669 [no assault "if the gun is in fact loaded with powder and a slight cotton wad, although [the defendant] believes it to be loaded with powder and ball"].) Yet here, defendant was convicted even though there was no evidence in the record the single misfired bullet in defendant's gun was capable of firing.

The majority relies exclusively on testimony the bullet was "live." (Maj. opn., *ante*, at pp. 8-10.) According to the majority, a live bullet is one that is " 'still intact,' " with gunpowder and the bullet still in the casing. (Maj. opn., *ante*, at p. 8.) But these facts alone cannot establish defendant had a present ability to fire a bullet. Gunpowder and a bullet may be *necessary* for bullet projection, but they obviously are not *sufficient* by themselves in all cases, otherwise the bullet here would have fired. Gunpowder and a bullet were also not enough in *People v. Ranson* (1974) 40 Cal.App.3d 317, 321, where the defendant's gun jammed. But the appellate court there concluded the defendant had present ability because he could "take off and rapidly reinsert the clip" properly. (*Ibid.*) There is no similar evidence defendant could rapidly make his gun and bullet operational.

Prosecutors have the burden to prove beyond a reasonable doubt the present ability element for assault with a firearm. (*People v. Cuevas* (1995) 12 Cal.4th 252, 260; CALCRIM No. 875.) While evidence a firearm is loaded typically permits the jury to presume a present ability to create violent injury (see, e.g., *People v. Orr* (1974) 43 Cal.App.3d 666, 672), this is *not* a typical case. The uncontroverted evidence was that

1

the cartridge's primer had been struck at least once and yet *did not successfully fire*. The officers testified to hearing multiple trigger pulls, and the criminologist testified it "was a very distinct firing pin impression" on the primer, indicating at least one complete trigger pull. There can be no presumption the bullet would fire on subsequent trigger pulls because it is undisputed *it had not fired before*. It was therefore the prosecutor's burden to introduce evidence establishing the bullet could fire. (Evid. Code, § 604 [rebuttable presumption applies "until evidence is introduced [that] would support a finding of its nonexistence, in which case the trier of fact shall determine the existence or nonexistence of the presumed fact from the evidence and without regard to the presumption"].) The prosecutor, however, did not test the bullet and the majority fills in the gap by assuming, without evidence, the bullet still had the capability of firing without any change in circumstances from when the bullet failed to fire.

The only testimony I can see that approaches a present ability is the detective's testimony there was a "chance [the bullet] still could" fire. A "chance" is still insufficient because the chance could be so low as to be near or effectively zero. But the detective did not identify the chance, and even if she had, there was no evidence on which to base this testimony because she did not test the bullet. (*People v. Cluff* (2001) 87 Cal.App.4th 991, 1002 [" ' "finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence" ' "].) Nor did she or any other witness testify that generally bullets misfiring under similar circumstances are likely to fire given repeated trigger attempts. The majority sweeps this all under the rug by assuming a bullet plus gunpowder is always sufficient, even in the face of the uncontroverted evidence that it was not sufficient here.

The trial court's comments on defendant's motion for a new trial highlight this point. Like the majority, the trial court also relied on the bullet "appear[ing] to be capable of firing," and presented a hypothetical: "[W]ould you point that bullet at a child after it has misfired two times or ten times and pull the trigger? Absolutely not." The

trial court was making the same assumption the majority does here, that a loaded firearm typically creates a present ability, but again, this is not a typical case. Needless to say, no reasonable person would point a loaded but faulty firearm at a child even if it was certain not to fire. But that is not the issue. The issue is the level of certainty defendant's gun would fire given the prior misfire and there was no evidence presented on this issue.

The trial court acknowledged there could be evidence on this point if the bullet was tested. The court told defense counsel it would have approved testing the bullet if defendant asked it to. But it was the *prosecutor's* obligation to test the bullet if that is the evidence the trial court needed to decide an element of the crime, not defendant's obligation. The trial court, as the majority does here, shifted the burden.

The trial court also did not identify any evidence supporting its finding and instead relied on supposition: "[T]he bullet *appeared* to be capable of firing. Just because you have a misfire on a bullet doesn't mean that bullet isn't going to fire." (Italics added.) There is no evidence in the record supporting this inference and the opposite inference seems just as reasonable—one misfire on a bullet does not mean that bullet *will fire*. But there is no evidence either way in the record, and our review is limited to the record.

There was therefore no substantial evidence the one misfired bullet in defendant's gun gave him a present ability to commit violent injury. There was also no evidence defendant had access to any other ammunition to quickly reload as was the case in *People v. Ranson*, *supra*, 40 Cal.App.3d at page 321. Nor any evidence defendant was in proximity to use the firearm as a bludgeon. I therefore dissent because I find no substantial evidence supporting defendant's assault with a firearm convictions. I similarly dissent from the majority's conclusion the trial court did not abuse its discretion by denying defendant's motion for a new trial.

Finally, the majority also baselessly disallows defendant 54 days of credit. (Maj. opn., *ante*, at pp. 12-13.) The plain language of Penal Code section 2900.5, subdivision (a) requires credits for all time served in residential "custody, including . . .

3

any time spent in a . . . hospital." Defendant was indisputably arrested and taken to a hospital where he resided for 54 days with restrictions to his freedoms as a person who had just been arrested for trying to fire a gun at five officers. This was certainly more than custody for purposes of an interrogation under *Miranda v. Arizona* (1966) 384 U.S. 436 or transportation to jail. (See *People v. Ravaux* (2006) 142 Cal.App.4th 914, 921 ["The custodial interrogation situations *Miranda* was meant to address are radically different than the type of residential custody that is the subject of section 2900.5"].) But the majority again helps the prosecution by assuming, without evidence, defendant was taken out of custody while residing in the hospital. (See *People v. Reinertson* (1986) 178 Cal.App.3d 320, 326 ["for purposes of credit, 'custody' is to be broadly defined"].) This strains credulity.

Ultimately, I do not dispute defendant's culpability. Defendant's actions were contemptible, pointing a loaded firearm at officers and pulling the trigger. But our law requires more for assault with a firearm; it requires defendant to have objectively had the present ability to fire the weapon. (*People v. Lee Kong*, *supra*, 95 Cal. at p. 669 [assault is not established by threatening with an unloaded gun "regardless of the fact whether the party holding the gun thought it was loaded, or whether the party at whom it was menacingly pointed was thereby placed in great fear"].) Finding no such evidence in the record, I must dissent.

        /s/                   
        ROBIE, Acting P. J.

4